**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

*FILED*
*AUG 06 2013*
*U.S. DISTRICT COURT*
*CLARKSBURG, WV 26301*

GLENN WHITT,

      **Plaintiff,**

v.                                 **Civil Action No. 1:12CV52**
                                              **(The Honorable Irene M. Keeley)**

MICHAEL J. ASTRUE,
**Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the Commissioner of the Social Security Administration ("defendant" and sometimes "Commissioner") denying Plaintiff Glenn Whitt's claim for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Glenn Whitt ("Plaintiff") filed his third application for SSI on January 27, 2004, alleging disability since September 1, 1998, for acute chronic obstructive pulmonary disease ("COPD"), bilateral carpal tunnel syndrome, seizures, torn rotator cuff in his right shoulder, acute tendinitis, arthritis, bursitis in his right shoulder, "back problem," right hip pain, and leg pain (R. 55, 228-30, 270)[1]. Plaintiff's application was denied initially and upon reconsideration (R. 117-18). Plaintiff

---

    [1]Plaintiff's first application was filed on October 1, 1998, and was denied initially and upon reconsideration. Plaintiff did not pursue an appeal (R. 122). Plaintiff's February 16, 2001, application (second) was denied initially and upon reconsideration; an administrative hearing was conducted on November 21, 2002, and Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified; an unfavorable decision was issued on November 25, 2002;

requested a hearing, and Administrative Law Judge Steven D. Slahta ("ALJ") held a hearing on April 14, 2005, and issued an unfavorable decision on August 3, 2005 (R. 166-75). Plaintiff appealed the ALJ's decision to the Appeals Council, and the Appeals Council remanded the case for further review (R. 178-80)[2]. Upon remand, ALJ Alexander conducted a new hearing on January 16, 2008. Plaintiff, who was represented by counsel, Dr. Irwin Chillag, a medical expert, and VE Cruzman testified (R. 1138-1204). ALJ Alexander issued an unfavorable decision on September 19, 2008 (R. 184-98). Plaintiff appealed the unfavorable decision to the Appeals Council, and the Appeals Council remanded the case on April 15, 2009, for further review and development by the ALJ (R. 200-02). Upon remand, ALJ Alexander held a hearing on September 10, 2009, at which Plaintiff, represented by counsel, Dr. Balk, a medical expert, and VE Ganoe testified (R. 1205-38). On April 21, 2010, ALJ Alexander issued a decision, finding that Plaintiff could perform a limited range of sedentary work (R. 55-74). Plaintiff filed an appeal with the Appeals Council, which denied his request for review on February 7, 2012, making ALJ's April 21, 2010, decision the final decision of the Commissioner (R. 9-13).

## II. FACTS

Plaintiff was born on September 16, 1969, and was forty (40) years on the date of the most recent decision (R. 72, 228). Plaintiff obtained his GED in 2001; his past relevant work included that

---

and Plaintiff appealed the Commissioner's decision to the Appeals Council, which denied his request for review (R. 122-40). Plaintiff filed his appeal with the United States District Court for the Northern District of West Virginia; the Commissioner's decision was affirmed by the Court (R. 141-63) (See NDWV 1:04cv104, Docket Entry 27). Plaintiff's alleged disabilities have, therefore, been adjudicated through November 25, 2002.

[2]The ALJ's decision date is listed as November 26, 2002; the actual date is August 3, 2005 (R. 185).

as a delivery vehicle driver for approximately two years (R. 72, 445). He last worked in 1996, at age 27, and has not attempted to work since.

A psychological evaluation was completed on Plaintiff by Cherie Zeigler, M.A., Licensed Social Worker, at United Summit Center, on February 1, 2002, for the purposes of "obtaining a medical card and SSI benefits." Plaintiff reported he sustained severe muscle "trauma and eventually developed [c]arpal [t]unnel [s]yndrome" from a 1996 motor vehicle accident, which caused him to stop working. Plaintiff reported he had grand mal seizures, which were hereditary; his mother and sister had grand mal seizures. Plaintiff stated he was disabled due to a "bad back," severe carpal tunnel syndrome, and seizures and was "unable to work until he receive[d] surgery for carpal tunnel." Plaintiff lived with his mother (R. 532, 758). Plaintiff medicated with Dilantin, Lorcet, and Flexeril. Plaintiff planned to participate in vocational rehabilitation in order to be employed at a job that was "more suitable to his abilities and that [would] not put him at risk for re-injury" (R. 533, 759).

Upon examination, Ms. Zeigler found Plaintiff was oriented, time four (4). His mood and affect were restricted; his concentration and attention were good; his speech was normal. His recent, remote and immediate memories were good. He had "problems" with anger control; he had poor appetite; he had difficulty going to sleep (R. 533, 759). Plaintiff scored the following on the Wechsler Adult Intelligence Scale - 3rd Edition ("WAIS-III"): Verbal IQ - 93; Performance IQ - 89; Full Scale IQ - 91. Ms. Zeigler found Plaintiff was in the average range of intellectual ability (R. 534, 760). Plaintiff scored the following on the Wide Range Achievement Test ("WRAT-3"): reading - 100; spelling - 81; and arithmetic - 95. Plaintiff was in the post high school grade level for reading, sixth grade level for spelling, high school grade level for math (R. 534-35, 760-61). Plaintiff's results on the Bender Gestalt showed no organic brain dysfunction. Ms. Zeigler diagnosed mood disorder with

3

mixed features due to severe muscle trauma, carpal tunnel syndrome, and grand mal seizures. Plaintiff's mood disorder was the result of pain and did not warrant psychiatric treatment at that time. Ms. Zeigler noted that Plaintiff had the "potential to become independent in his support," and, after carpal tunnel surgery and vocational training, he could "return to the work force." She also noted that Plaintiff "may be" dependent on pain medication. She recommended Plaintiff be treated at a pain clinic for "rehabilitation and pain management interventions" (R. 535, 761). There is no indication in the record that he did so.

Plaintiff was sent by his treating physician, Dr. Rondal Boyce, for a functional capacity evaluation ("FCE") on December 2, 2002 (R. 409). The FCE was prepared by Physical Therapist Kevin Boring. The Summary Report states as follows:

> Overall test findings, in combination with clinical observations, suggest the presence of variable levels of physical effort on Mr. Whitt's behalf. In describing sub-maximal effort, this evaluator is by no means implying intent. Rather, it is simply stated that Mr. Whitt can do more physically at times than was demonstrated during this testing day. Any final vocational or rehabilitation decisions for Mr. Whitt should be made with this in mind.

> Overall test findings, in confirmation with clinical observations, suggest considerable question be drawn as to the reliability/accuracy of Mr. Whitt's subjective reports of pain/limitation. While his subjective reports should certainly not be ignored, they should be considered within the context of his RCR ("Reliability of Client Reports") findings. Significantly more weight should be placed upon objective findings versus subjective reports. In describing such findings, this evaluator is by no means implying intent. Rather, it is simply stated that Mr. Whitt can do more at times than he currently states or perceives. While his subjective reports should not be disregarded, they should be considered within the context of such RCR findings.

Despite these findings, Physical Therapist Boring found Plaintiff performed at the light-to-medium Physical Demand Level ("PDL") during testing. He recommended Plaintiff follow up with a medical doctor (he was referred by his treating physician), stating, "He needs consultation regarding diagnoses, especially his excessive smoking, depression, and other conditions. He may benefit from a

4

comprehensive physical therapy program to address the musculoskeletal problems he has reported." Plaintiff reported smoking 4 packs of cigarettes per day.

PT Boring first assessed multiple myotomal upper and lower strength loss, decreased cervical side bending to the left; decreased right shoulder internal rotation; decreased postural awareness; tenderness to right lateral cervical transverse processes; right shoulder impingement, and tight IT band and hip rotators (R. 416). His "pinch strength" was below average. His grip strength was well below average. He was noted to repetitively shake out and rub his hands during testing. He was observed to demonstrate no signs of competitive test performance. He ambulated on the treadmill at speeds from only .7 mph to 1 mph for only 6 minutes, before stopping secondary to his reported of increased lower back pain.

Testing also suggested low effort or a lack of full effort in upper extremity testing (R. 423). The report indicted he showed "markedly" few examples of competitive test performance. Plaintiff also presented with multiple inconsistencies during distraction-based testing. Overall PT Boring reported the test findings in combination with clinical observations, suggested the presence of variable levels of physical effort on Plaintiff's part, again stating: "In describing the sub-maximal effort, this evaluator is by no means implying intent. Rather, it is simply stated that Mr. Whitt can do more physically at times than was demonstrated during this testing day. Any final vocational or rehabilitation decisions for Mr. Whitt should be made with this in mind."

Further, Reliability of Client Reports ("RCR") indicated Plaintiff presented with 4 of 7 inappropriate (anatomically unreasonable) responses, suggestive of inappropriate illness behavior. In addition, subjective ratings of pain matched poorly with distraction-based clinical observations and repetitive movement reports matched poorly with clinical observations. During the intake interview

5

process, Plaintiff was noted to show no signs of physical discomfort. All results indicated that Plaintiff perceived himself as meeting the physical requirements for sedentary strength work, according to Department of Labor standards. His subjective reports matched poorly with distraction-based objective findings. He showed no signs of physical discomfort during the Spinal Function Sort.

Dr. Shiv U. Navada completed motor nerve and sensory nerve conduction studies of Plaintiff on March 27, 2002. Dr. Navada found the "study [was] abnormal and [was] supportive of bilateral carpal tunnel syndrome" with "changes . . . more prominent on the right side" (R. 763-64).

Plaintiff's April 4 and 5, 2002, psychological evaluation, completed by Wilda Posey, M.A., showed Plaintiff's intellectual functioning was in the average range; he had no organic brain dysfunction; his judgment was average; his comprehension was normal; his insight was poor; his concentration was average; and it "appear[ed]" Plaintiff had "some problems with insight to his emotional problems." Plaintiff had never been married and was not in a relationship at the time of the evaluation. He lived with his mother and helped care for her (R. 770). Ms. Posey noted Plaintiff underwent the evaluation to "assist with his eligibility for Social Security disability" (R. 774). Plaintiff was diagnosed with major depressive disorder, without psychotic features, moderate; alcohol abuse; cannabis related disorder; and schizoid personality disorder (R. 773). Ms. Posey noted Plaintiff met the criteria for schizoid personality disorder due to his "report of . . . social relationships, solitary activities, flattened affect and other criteria." Ms. Posey recommended Plaintiff be evaluated by a psychiatrist for "possible medications" (R. 774).

Plaintiff's April 17, 2002, electroencephalogram ("EEG") was "abnormal due to mild intermittent slowing noted in a generalized distribution" (R. 794).

Dr. Navada examined Plaintiff on November 12, 2002. He found Plaintiff's symptoms, arm pain, muscle soreness, and difficulty sleeping were secondary to depression and referred Plaintiff to the Summit Center. Dr. Navada noted Plaintiff had chronic pain syndrome, but "no significant neurologic abnormalities [had] been identified." Plaintiff did not have myopathy. Dr. Navada found Plaintiff required "no specific drug therapy." Dr. Navada noted Plaintiff had not had a seizure in "several months." Plaintiff was released from his care (R. 819).

Dr. Martin Buda, M.D., a psychiatrist, completed a psychiatric evaluation of Plaintiff on December 30, 2002. Plaintiff reported he had been depressed and unable "to function reasonably" for several years. Plaintiff had been diagnosed with a seizure disorder and was medicated with Dilantin. Plaintiff stated he had difficulty going to and staying asleep, felt anxious and nervous, had lost weight, felt demoralized, and was worried. Plaintiff stated he sustained injuries in a motor vehicle accident in which his girlfriend died. Plaintiff had previously been arrested for driving under the influence. He smoked four (4) packages of cigarettes per day. Upon examination, Plaintiff was alert and oriented, times three (3). His affect was responsive. Plaintiff "somehow tended to speak in a low monotone and gave the impression [he] was unable to consider activity." There was no evidence of "[S]chneiderian symptomatology or hypomanic behavior." Plaintiff "appeared" to be at his optimal baseline. Dr. Buda diagnosed depressive disorder (R. 441). He prescribed Remeron (R. 442).

Plaintiff presented to Braxton Community Health Center on March 10, 2003, and stated he experienced morning stiffness and pain when he attempted to do "anything." He was prescribed Remeron and Lorcet (R. 515).

Plaintiff's March 12, 2003, chest x-ray was normal (R. 511).

Plaintiff's March 14, 2003, shoulder MRI showed "worrisome . . . partial thickness tear of the rotator cuff . . . ." No "full thickness tear or retraction of the tendon" was noted (R. 510).

Plaintiff presented to Braxton Community Health Center on April 7, 2003, for follow-up to his pain. He was prescribed Nicoderm (R. 509).

Plaintiff's April 11, 2003, MRI showed mild disc bulge at C5-C6 without evidence of either disc herniation or spinal stenosis (R. 508).

Plaintiff was examined by Dr. Joseph A. Snead on April 24, 2003, for right shoulder pain. Dr. Snead found Plaintiff had full range of motion of his right shoulder, with pain at ninety (90) degrees. He had positive impingement sign. He had a negative Sulkier sign. Dr. Snead reviewed Plaintiff's x-ray and found it was "fairly normal." Plaintiff's MRI showed "some lucency in the supraspinous tendon"; however, the tendon appeared to be intact. Dr. Snead found Plaintiff had "either tendinitis or a partial tear" (R. 836). He injected Plaintiff's right shoulder with Xylocaine and Cortisone. Plaintiff realized "good relief" from the injection. Dr. Snead did not recommend surgery (R. 837).

On May 3, 2003, James Hines, a clinician at United Summit Center, reported that a barrier to Plaintiff's treatment for "somatic concerns" was that he received doctor's care only (R. 831). The barrier to Plaintiff's efforts to increase his concentration was that Plaintiff was unwilling to accept suggestions (R. 832). Clinician Hines found the barrier to Plaintiff's improving socialization was that he was not motivated (R. 833). The barrier to Plaintiff's reducing hostility and self neglect was noncompliance with treatment (R. 834).

Plaintiff presented to Braxton Community Health Center on May 5, 2003, for refills on all medications. He reported he had received a "joint injection" in his shoulder from Dr. Snead. He was instructed to stop smoking. He was prescribed Dilantin, Remeron, Lorcet and Baxtra (R. 506).

On June 30, 2003, Plaintiff presented to Braxton Community Health Center for medication refills. He stated his arms were "still bothering" him. He was prescribed Lorcet (R. 505).

Plaintiff presented to Braxton Community Health Center on September 3, 2003, with reports of back, hip and right arm pain. He was prescribed Lorcet (R. 504).

Plaintiff presented to Braxton Community Health Center on October 29, 2003, with "trouble breathing" and possible kidney stones. A CT scan of his abdomen was ordered; he was prescribed Lorcet and Dilantin (R. 501).

Plaintiff's CT of his abdomen and pelvis showed right nephrolithiasis and no stones (R. 502). His chest x-ray was normal (R. 503).

Plaintiff presented to Braxton Community Health Center on November 4, 2003, with shoulder pain caused by his "hanging crown molding (sic)." He was prescribed Mobic (R. 500).

On November 26, 2003, Plaintiff was prescribed Lorcet for myalgias and Proventil for cough by a physician at Braxton Community Health Center (R. 499).

On January 6, 2004, Plaintiff was treated for depression by Charles S. Scharf, M.D. Plaintiff stated he was depressed "during the holidays," but he "generally bounce[d] back." Dr. Scharf thought Plaintiff's inability to work caused much of his depression. Dr. Scharf continued Plaintiff's prescriptions of Xanax and Remeron and noted he had no adverse side effects from them (R. 520).

Plaintiff presented to Braxton Community Health Center on January 21, 2004, with a constant cough. He was prescribed Singulair, Combivent, and Lorcet and told to stop smoking (R. 498).

Plaintiff presented to treating physician Dr. Boyce on January 25, 2004, for refills on his medication and complaints of back pain. Plaintiff reported he had recently injured his back while shoveling snow. Plaintiff reported he had had a seizure three (3) weeks earlier. Dr. Boyce diagnosed

lumbar strain, carpal tunnel syndrome, and seizure disorder and prescribed Lorcet Dilantin and Flexeril (R. 728).

A Routine Abstract Form Mental was completed on Plaintiff by Danielle Lidley of United Summit Center on February 26, 2004. Ms. Lidley noted Plaintiff's February 1, 2002, WAIS-III and WRAT-3 scores (R. 522). Ms. Lidley found Plaintiff's speech, judgment, insight, perception, thought content and psychomotor activity were normal. Plaintiff had no delusions, hallucinations, or suicidal or homicidal ideations. Plaintiff's affect was restricted and mood was depressed (R. 523). Plaintiff's memory, concentration, persistence and pace were normal. Ms. Lidley made no finding as to Plaintiff's social functioning (R. 524). Plaintiff had been diagnosed with major depressive disorder, single episode, moderate. The "treatment team recommended psychotherapy, but [Plaintiff] refuse[d] this modality" (R. 525). Plaintiff was medicating with Xanax and Remeron (R. 524).

Plaintiff presented to Braxton Community Health Center on March 22, 2004, with complaints of shoulder and elbow pain and chronic cough. Plaintiff was prescribed Combivent and Advair. He was instructed to stop smoking (R. 497).

On April 5, 2004, Robert J. Klein, Ed.D., completed a psychological examination of Plaintiff. Plaintiff drove seventy-two (72) miles, round trip, to attend the examination. He weighed one-hundred, forty-two (142) pounds. He lived with his mother. His attitude was good, cooperation was good, and gait was slow and stiff. Plaintiff reported he had "'seizures, breathing problems, acute COPD, carpal tunnel syndrome, torn rotary (sic) cuff in right shoulder, bursitis in the right shoulder, . . . arthritis, acute tendinitis, back problems, right hip pain, kidney stones, uncontrollable bladder syndrome, major depressive disorder, anxiety disorder, and schizoid personality disorder.'" Plaintiff stated no one would hire him due to his "complications" (R. 443).

Plaintiff reported he "toss[ed] and turn[ed] all night and 'smoke[d] ½ pack of cigarettes at night.'" His appetite was good; he had gained thirty (30) pounds in the past two (2) years "as a result of utilizing Remeron." Plaintiff had crying episodes twice monthly. His energy level was poor, due to fatigue caused by breathing difficulty. He had lost interest in activities; he felt guilt over not being able to support himself. Plaintiff's ability to concentrate, focus, and make decisions were decreased due to pain. Plaintiff's mood was "angry, depressed, and tired." Plaintiff had a panic attack once every six (6) months. Plaintiff avoided going to public places because he felt "out of place," got angry and felt as though people were judging him. Plaintiff had not received inpatient mental health care. It had been recommended by "several individuals" that he undergo counseling, but he would "not take it"; he medicated with Lorcet, Dilantin, Combivent, Advair, Remeron and Xanax (R. 444).

Plaintiff reported he smoked two (2) to two-and-one-half (2 ½) packages of cigarettes per day (R. 444). Plaintiff stated he drank more than a case of beer a day from the time he was a teen until he was twenty-three (23) years of age. Plaintiff stated he had drunk one (1) beer two (2) days ago and that had been the first beer he had had in eight (8) months. He had not smoked marijuana during the past six (6) months; he used to smoke two (2) joints per week; as a teenager, he smoked three (3) joints a day. When aged eighteen (18), Plaintiff "utilized" LSD, cocaine, pure THC, and PCP once (R. 445).

Plaintiff reported he quit school in ninth grade "after spending four years in the 9th grade." Plaintiff then attended adult education until the 11th grade. Plaintiff then received his GED in 2001. Plaintiff was not in special education classes. Plaintiff reported he received "'pretty good grades when" he attended school. He could read and write. He had a driver's license. He passed the written examination on the first attempt. Plaintiff quit his job at Metro Bolt Fasteners in 1996 due to injuries he sustained in a 1996 automobile accident. Plaintiff worked, from 1994 to 1996, as a delivery driver

and box builder. Plaintiff "got along good (sic) with coworkers and supervisors." Plaintiff stated he did not stop working due to mental conditions. Plaintiff had not attempted to return to work (R. 445).

Upon mental status examination, Plaintiff had a good attitude; he was cooperative; his social interaction was minimally appropriate; he made appropriate eye contact; his verbal responses were appropriate; his speech was coherent, relevant, and spontaneous; and his persistence and pace were normal. Plaintiff's mood was lethargic, affect restricted, insight mildly deficient, and judgment normal. Plaintiff's thought content was positive for paranoid ideations "that began in approximately 1998 when he began having health problems." Plaintiff's immediate and remote memories were within normal limits. His recent memory was markedly deficient. Plaintiff's concentration was mildly deficient; his psychomotor behavior was normal (R. 446).

Plaintiff listed the following activities of daily living: he watched television and that was "pretty much it." He showered weekly without assistance; he did laundry once every four (4) to six (6) months when his mother was gone; he did not wash dishes, sweep, mop, vacuum, dust or cook; however, he "frie[d] hamburgers, eggs, and [made] canned soup." Plaintiff mowed several acres with a riding mower. It took several days to complete this task. He did not carry wood. He drove once every two (2) months. He did not grocery shop. He did not write checks; he had "never completed yearly taxes." Plaintiff kept track of his medical appointments and administered medication to himself. He did not dine out. Plaintiff stated he could "fix 'anything' on an automobile and [did] when something [went] wrong with the automobile." Plaintiff had no hobbies. Dr. Klein found Plaintiff's social functioning, during Plaintiff's examination, was within normal limits; however, Plaintiff reported he did not go to the movies, he did not visit people, he did not go to church. Dr.

Klein found Plaintiff could manage his finances (R. 447). Dr. Klein diagnosed social phobia and chronic adjustment disorder with depressed mood (R. 446).

Dr. Scharf noted, on April 6, 2004, that Plaintiff "suffer[ed] from Major Depression, which [was] in partial state of remission." Plaintiff was "nervous to a degree, but his depression seem[ed] to be under fairly good control, given the fact that he [was] financially destitute and [was] in pain." Dr. Scharf continued Plaintiff's prescriptions for Xanax and Remeron (R. 519).

Frank Roman, Ed.D., completed a Psychiatric Review Technique of Plaintiff on April 16, 2004. He found Plaintiff had affective and anxiety-related disorders (R. 449). Plaintiff's affective disorder was adjustment disorder; his anxiety-related disorder was social phobia (R. 452, 454). Dr. Roman found Plaintiff had mild limitations in his activities of daily living and in his ability to maintain concentration, persistence, and pace. Plaintiff had moderate limitations in social functioning (R. 459).

Also on April 16, 2004, Dr. Roman completed a Mental Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff had no limitations in his ability to understand and remember (R 463). As to Plaintiff's sustained concentration and persistence, Dr. Roman found Plaintiff was not significantly limited except for his being moderately limited in his ability to work in coordination with or proximity to others without being distracted by them and his ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (R. 463-64). Dr. Roman found, as to Plaintiff's social interaction, that he was not significantly limited in his ability to ask simple questions, request assistance, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Plaintiff was moderately limited in his ability to interact appropriately with the general public, accept instructions, respond appropriately to criticism from

supervisors, get along with coworkers or peers without distracting them, or exhibiting behavioral extremes. In the "adaption" category, Dr. Roman found Plaintiff was not significantly limited in his ability to respond appropriately to changes in the work setting, be aware of normal hazards, and take appropriate precautions. Plaintiff was not limited in his ability to travel to unfamiliar places, use public transportation, set realistic goals, or make plans independent of others (R. 464).

Plaintiff reported to Braxton County Memorial Hospital's Emergency Department on April 25, 2004, with epigastric pain, left flank pain, nausea, heartburn and reduced appetite (R. 467). An abdominal x-ray showed right lower pole nephrolithiasis and possible granulomas (R. 469, 495). His chest x-ray showed "no evidence of acute disease" (R. 492). He was prescribed Zantac (R. 474).

On April 27, 2004, Dr. Arturo Sabio completed a consultative examination of Plaintiff. Plaintiff's chief complaints were for shortness of breath, seizures, low back pain, arthritis pain and depression. Dr. Sabio reviewed Plaintiff's October, 29, 2003, chest x-ray, which was normal; April 15, 2003, MRI of the cervical spine, which showed minor disc bulge at C5-C6; March 18, 2003, MRI of the shoulder, which showed a partial thickness tear of the rotator cuff; and Dr. Boyce's records in which he diagnosed Plaintiff with COPD and seizures (R. 476). Plaintiff reported he became short of breath after walking for about one-hundred (100) feet on level ground; he did not have wheezing; he coughed; he smoked two (2) packages of cigarettes per day; and he used oxygen at home. He had a seizure three (3) months earlier; he had low back pain, which he successfully treated with ice and heat; bending, stooping, heavy lifting, sitting in one position for thirty (30) minutes, and riding/driving a car for twenty-five (25) miles increased back pain; he had right shoulder pain; he had numbness and pain in the palms and fingers of both hands; and he had left shoulder pain, which was relieved by an injection (R. 477). Plaintiff reported he medicated with Lorcet, Remeron, Dilantin, Xanax, Advair,

albuterol and Atrovent, but Plaintiff stated he "was not taking [the] inhaler." Plaintiff, who was five (5) feet, five (5) inches tall, weighed one-hundred, thirty-six (136) pounds (R. 478).

Upon examination, Dr. Sabio found Plaintiff had shortness of breath on minimal exertion; he had rhonchi; he coughed; he did not have wheezing; there was no muscle retraction; and he had prolonged expiratory phase of breathing. Plaintiff had tenderness in both wrists; his second, third and fourth digit fingertips of both hands were numb; he had no swelling or effusion; he had no trophic changes to the skin. He realized significant relief from seizure disorder with Dilantin. His neurological examination was normal; he had no gross neurologic deficit. He had poor sleep; his memory was intact; he was able to interact normally. He complained of arthritis pain in his right shoulder and lower back. His gait was normal; he was stable at station. His upper and lower extremity joints did not have tenderness, swelling, effusion, or stiffness. Plaintiff's ranges of motion, in both the upper and lower extremities, were normal. His spine curvature was normal; he had no spinal tenderness. He had wrist tenderness. Dr. Sabio diagnosed chronic obstructive pulmonary disease, secondary to tobacco abuse; seizure disorder; and carpal tunnel syndrome (R. 480).

Plaintiff presented to Braxton Community Health Center on May 3, 2004, with complaints of epigastric pain; he was prescribed Prilosec (R. 494).

Plaintiff informed Dr. Boyce, on May 17, 2004, that Prilosec did not "help GERD." He had had no seizures. He had reduced breath sounds. Dr. Boyce diagnosed GERD, osteoarthritis, seizure disorder, and tobacco dependence. Plaintiff weighed one-hundred, thirty-three (133) pounds. Dr. Boyce prescribed Lorcet, Dilantin, Protonix, Reglan and instructed Plaintiff to stop smoking (R. 613).

Dr. Thomas Lauderman, a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff on May 20, 2004. Dr. Lauderman found Plaintiff could occasionally

lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk for about six (6) hours in an eight (8) hour workday; sit for about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 485). Dr. Sabio found Plaintiff could never climb ladders, ropes, or scaffolds. Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl (R. 486). Plaintiff had no manipulative, visual, or communicative limitations (R. 487-88). Plaintiff should avoid extreme cold and heat. Plaintiff should avoid all exposure to hazards. Dr. Sabio found Plaintiff was unlimited with his exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation (R. 488).

Dr. Susan Long examined Plaintiff on May 27, 2004, for abdominal pain. Except for decreased breath sounds, Plaintiff's examination was normal. Dr. Long diagnosed abdominal pain and reflux and recommended Plaintiff have an esophagogastroduodenscopy ("EGD") (R. 569-70, 626-27).

Plaintiff's June 3, 2004, EGD showed inflammation in "the upper GI tract" (R. 571, 625).

Plaintiff presented to Braxton Community Health Center on June 17, 2004, for a one-month follow-up examination. He reported he was "doing better" but had not passed a kidney stone (R. 493).

On July 8, 2004, Dr. Scharf noted Plaintiff had been more depressed because he had been told that he was "bleeding from the upper GI system, with a lot of inflammation." Plaintiff also stated he had been diagnosed with emphysema. Dr. Scharf prescribed Effexor; Plaintiff continued to medicate with Remeron and Xanax (R. 518).

On July 29, 2004, Dr. Scharf noted Plaintiff medicated with Lexapro, Remeron, and Xanax. Plaintiff stated he felt his "depression [was] a bit better, but he continue[d] to have significant depressed affect and mood." Plaintiff had no side effects from Lexapro. Dr. Scharf increased Plaintiff's dosage of Lexapro (R. 517).

Plaintiff was evaluated by Rachelle Furby, at United Summit Center, on August 10, 2004. Plaintiff was anxious and agitated because he had been "informed [his] doctor would be leaving" the Center. Plaintiff stated he was "doing better with sleep" and was stable on Lexapro (R. 521).

On August 16, 2004, a state-agency physician completed a Mental Residual Functional Capacity Assessment of Plaintiff. Plaintiff was moderately limited in his ability to understand and remember. Plaintiff was not significantly limited in sustained concentration and persistence, except for moderate limitations in his ability to carry out very short, simple or detailed instructions (R. 537-38). In the social interaction category, Plaintiff was not significantly limited in his ability to ask simple questions, request assistance, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. Plaintiff was moderately limited in his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Plaintiff had no limitations in his adaption abilities (R. 538).

The state-agency physician also completed a Psychiatric Review Technique of Plaintiff on August 16, 2004. Plaintiff had an anxiety-related disorder, specifically social phobia (R. 541). Plaintiff had mild limitations in his activities of daily living and ability to maintain concentration, persistence and pace. His social functioning was moderately limited (R. 551).

On August 18, 2004, Fulvio Franyutti, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff (R. 555). Dr. Franyutti found Plaintiff could occasionally lift and/or carry fifty (50) pounds; frequently lift and/or carry twenty-five (25) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour work day; sit for a total of about six (6) hours in an eight (8) hour work day; and push/pull unlimited (R. 556). Dr. Franyutti found

Plaintiff could frequently balance, stoop, kneel, crouch and crawl. He could occasionally climb ramps and stairs and could never climb ladders, ropes or scaffolds (R. 557). Dr. Franyutti found Plaintiff had no manipulation limitations except for feeling (R. 558). Plaintiff had no visual or communicative limitations (R. 558-59). Dr. Franyutti found Plaintiff should avoid concentrated exposure to extreme cold, heat, fumes, odors, dusts, gases, and poor ventilation; he should avoid all exposure to hazards. Plaintiff's exposure to wetness, humidity, noise, and vibration were unlimited (R. 559).

Plaintiff's August 26, 2004, abdomen CT scan showed a "well-circumscribed hypodense lesion" on the right lobe of the liver, which was "probably benign" (R. 567, 856).

Plaintiff presented to Dr. Boyce on September 10, 2004, with complaints of right-side back pain and abdominal pain. Plaintiff had not passed a kidney stone. Plaintiff stated his COPD was "bad." He smoked two (2) packages of cigarettes per day. Dr. Boyce noted Plaintiff's CT scan showed a cyst on his liver. Dr. Boyce prescribed Spiriva, Remeron, albuterol, Advair, Protonix, Lexapro, Xanax and Lorcet. Dr. Boyce instructed Plaintiff to stop smoking (R. 612).

Plaintiff's September 14, 2004, spirometric test showed early obstructive pulmonary impairment (R. 623, 920, 1038).

Plaintiff reported to Dr. Boyce on October 12, 2004, that his kidney stones had been "bothering" him. Plaintiff had not had any seizures; his COPD was "bad." Plaintiff smoked two (2) to two-and-a-half (2 ½) packages of cigarettes per day. Upon examination, Dr. Boyce found Plaintiff had decreased breath sounds. He diagnosed kidney stone, COPD, and tobacco dependence. Dr. Boyce instructed Plaintiff to stop smoking (R. 611).

Plaintiff's October 18, 2004, x-ray of his right flank showed a "non-obstructing stone in the proximal right ureter" (R. 622).

Plaintiff presented to Dr. Boyce on October 28, 2004, with complaints of flank pain. He stated he "hurt[] all over"; he had not passed the kidney stone. Plaintiff smoked two-and-one-half (2 ½) to three (3) packages of cigarettes per day. Dr. Boyce diagnosed kidney stone, COPD and tobacco abuse. Dr. Boyce prescribed hydrochlorothiazide ("HCTZ"), Duragesic, and Lorcet. Dr. Boyce instructed Plaintiff to add cranberry pills to his diet and reduce his soda intake. Dr. Boyce discussed with Plaintiff, "at length[,] that he need[ed] to quit smoking" (R. 610).

On November 24, 2004, Plaintiff presented to Dr. Boyce with complaints of "stomach problems." He had fallen down stairs earlier in the day. Plaintiff weighed one-hundred-forty-eight (148) pounds. Plaintiff reported his shortness of breath was "about the same." He smoked two (2) packages of cigarettes per day. Dr. Boyce prescribed Duragesic and Prevacid (R. 609).

Plaintiff presented to Dr. Boyce on December 22, 2004, for refills of his medications. Plaintiff stated he was "still having difficulty" with his back. He had fallen the previous month. He smoked two (2) to two-and-one-half (2 ½) packages of cigarettes per month. Dr. Boyce instructed Plaintiff to cease smoking. He diagnosed tobacco dependence, COPD, osteoarthritis, renal stones, and GERD. Dr. Boyce prescribed albuterol, Dilantin, Prevacid, Xanax, Lorcet, Duragesic, and HCTZ (R. 608).

On January 4, 2005, Plaintiff was treated at Richwood Area Community Hospital Rural Health Clinic for back pain. Plaintiff's breathing was "about the same." Plaintiff reported he smoked two-and-one-half (2½) packages of cigarettes per day. His breath sounds were regular. He was diagnosed with myofascial pain syndrome and COPD, prescribed Lorcet and instructed to stop smoking (R. 892).

On January 25, 2005, Plaintiff presented to Dr. Boyce for follow-up for emphysema. Plaintiff reported cold exacerbated his emphysema, his back was "bothering" him, and he could not tolerate

Prevacid. Plaintiff's weight was one-hundred-fifty (150) pounds. Dr. Boyce diagnosed COPD and prescribed albuterol, Protonix, Theo-Dur, and Duragesic (R. 607).

Plaintiff was provided portable oxygen by Lincare on January 26, 2005 (R. 577).

Plaintiff was provided portable oxygen by Lincare on February 2, 2005 (R. 575).

Plaintiff presented to Dr. Boyce on March 1, 2005, for refills on his medications. Plaintiff stated he was "doing the same." Plaintiff weighed one-hundred-fifty-three (153) pounds. Plaintiff wore the oxygen mask before bed and when he woke. Plaintiff reported he had not had a seizure, his back was stiff, and he had not passed a kidney stone. Dr. Boyce diagnosed COPD and increased Plaintiff's dosage of Xanax and albuterol. He instructed Plaintiff to stop smoking (R. 606).

On June 7, 2005, Ms. Szabo noted Plaintiff had shown no improvement in symptoms. Plaintiff was unwilling to receive therapy. Ms. Szabo noted Plaintiff would "see Dr. Scharf once more to get medication refilled and then" he would be discharged (R. 615). Ms. Szabo noted Plaintiff had no improvements in his anxiety and agitation; he had low energy, low sleep, and changes in appetite. Plaintiff refused to participate in therapy and was discharged to his primary care physician (R. 616-17).

A June 27, 2005, chest x-ray was normal (R. 1052). A June 30, 2005, EGD showed mild gastritis and esophagitis which appeared somewhat improved from the previous EGD. Plaintiff was negative for any dysplasia (R. 1055).

Plaintiff presented to Dr. Boyce at Braxton Community Health Center on August 5, 2005, to obtain refills of his prescription medications. He wanted the doctor to "work on his back." Plaintiff reported creatine was "helping him with his stomach pain." Plaintiff reported that Duragesic and Lorcet "ease[d] his pain but [did] not take it away." Plaintiff stated his depression was "worse today [because he was] denied for Social Security." Plaintiff reported he had had no seizures. He still fell

asleep with lit cigarettes. He was diagnosed with COPD, tobacco dependence, and osteoarthritis. He was prescribed Carafate and Lorcet (R. 1058).

Plaintiff was assessed by Cynthia Szabo at United Summit Center on March 9, 2005. Plaintiff stated he had kidney stones, torn rotator cuff, cyst on liver, back "problems" and emphysema. He was unable to work due to health problems. Ms. Szabo scheduled a psychological evaluation "with the hope of him receiving SSI." Ms. Szabo noted Plaintiff had symptoms of depression (R. 614).

Michael Morrello, M.S., of Chameleon Health Care, completed a Psychological Evaluation of Plaintiff on March 24, 2005, upon referral by Plaintiff's lawyer (R. 628). Plaintiff reported he had had surgery for carpal tunnel syndrome and surgery to treat kidney stones. He could not remember the last time he had had a panic attack. He had had a seizure one (1) month earlier. Plaintiff had not drunk alcohol or smoked marijuana during the past two (2) years. Pain interrupted his sleep; he felt "sore" when he woke; he ate two (2) meals daily and an occasional snack; he had difficulty caring for his personal hygiene; pain interfered with his ability to concentrate; he was easily distracted; he had no friends and felt lonely; he could not engage in many activities; he did not visit others and did not entertain visitors; he watched television; and he lived with his mother.

Ami E. Cook, a staff member at United Summit Center, completed a Progress Summary of Plaintiff on September 6, 2005. Ms. Cook noted Plaintiff had moderate anxiety and depression. Plaintiff stated he "had starting feeling somewhat better, which he attributed to his medications, until he received his sixth denial letter for social security benefits three weeks ago." Plaintiff had no suicidal or homicidal ideations. Ms. Cook found Plaintiff was oriented, times four (4), and his affect was "moderately blunted." (R. 1079).

Plaintiff presented to Dr. Boyce at Braxton Community Health Center on September 14, 2005, for refills of prescription medications and his "messed up back." Plaintiff reported he injured his back bending and picking up a "wash bag." He was prescribed albuterol (R. 1059).

Plaintiff presented to Dr. Boyce at Braxton Community Health Center on October 14, 2005, for treatment of somatic dysfunction and COPD. Plaintiff stated the cold weather was "killing him" and he had diffuse myalgias. He was still falling asleep with lit cigarettes. Plaintiff informed Dr. Boyce that he was "having a great deal of difficulty getting SSDI." Dr. Boyce found Plaintiff was not a "candidate for NSAID therapy 2 severe." He diagnosed Plaintiff with somatic dysfunction, fibromyalgia, COPD, and tobacco abuse and prescribed Duragesic, Lorcet, and Lexapro (R. 1060).

Plaintiff presented to Dr. Boyce at Braxton Community Health Center on November 16, 2005. He stated he "hurt[] all over." He reported he had been sleepwalking and "sleep" smoking; he had to hide cigarettes from himself. He had shortness of breath. He was diagnosed with fibromyalgia and tobacco dependence and prescribed Xanax, Duragesic, Advair, and albuterol (R. 1061).

On December 9, 2005, Plaintiff presented to Dr. Boyce at Braxton Community Health Center for follow-up examination for COPD and fibromyalgia. Plaintiff reported he had a cold, and it was worsening his COPD. Plaintiff reported he continued to fall asleep with a lit cigarette. He was diagnosed with COPD, fibromyalgia, and tobacco dependence. Dr. Boyce prescribed Lorcet and Duragesic and "filled out disabled parking form" (R. 1062).

Plaintiff presented to Dr. Boyce at Braxton Community Health Center on January 7, 2006, for refill of his prescription medications. Plaintiff experienced breathing difficulty. He had no seizure activity. He was diagnosed with bronchitis, fibromyalgia, and COPD. Dr. Boyce prescribed albuterol, Theo24, Protonix, and Duragesic (R. 1063).

On January 11, 2006, Plaintiff reported to Dr. Boyce at Braxton Community Health Center that he had left shoulder pain. He was diagnosed with tendonitis and provided an injection (R. 1064-65).

Plaintiff presented to Dr. Boyce at Braxton Community Health Center on February 7, 2006, with complaints that he had difficulty ambulating. He had "falling spells" and had been "tripping." His breathing was "'ok.'" Dr. Boyce diagnosed Plaintiff with COPD, osteoarthritis, tobacco dependence, fibromyalgia and prescribed Duragesic, Lorcet, Xanax, and Remeron (R. 1066). Dr. Boyce injected Plaintiff's right shoulder with Lidocaine, Sensorcaine, and Kenalog (R. 1067).

On March 7, 2006, Plaintiff informed Dr. Boyce he was getting another kidney stone. He had forgotten to take his "afternoon Dilantin" and had a slight seizure. His breathing was "so so." The shoulder injection did not "help"; his right arm was "giving him a lot of problems." Plaintiff continued to fall asleep at night with a lit cigarette. Dr. Boyce diagnosed fibromyalgia, osteoarthritis, COPD, and tobacco dependence and prescribed Spiriva, Lorcet, Lexapro, and albuterol (R. 1068).

Plaintiff tested positive for THC and opiates on June 2, 2006, when he was tested in the lab at Braxton County Memorial Hospital (R. 1043). He was negative for benzodiazepines, which he was also prescribed. When a screening was conducted on the same specimen on June 7, 2006, at the SVI Lab Services, an affiliate of Mayo Medical Laboratories, it was found to be negative for THC (R. 1041). That lab also confirmed Plaintiff was negative for benzodiazepines, which he was prescribed and supposedly taking.

Plaintiff presented to Dr. Stewart at Braxton Community Health Center on July 25, 2006, for refills of his prescription medications. Dr. Stewart reviewed Plaintiff's medication chart with him and discussed "addictive/tolerance issues," instructed Plaintiff to seek alternative care, and advised he would supply prescriptions in the interim. (R. 1044).

Ms. Cook, of United Summit Center, completed an Initial Assessment of Plaintiff on August 29, 2006. Ms. Cook noted Plaintiff was a "readmission of a closed case" and had been referred by "WVDHHR to receive a psychiatric evaluation to aid in Medicaid coverage determination."' He lived with his mother. Plaintiff stated he had experienced moderate depression and anxiety for ten (10) years. Plaintiff reported he had been attempting to receive Social Security benefits since 2002; he had not worked in ten (10) years due to pain. Plaintiff stated he had "no life, no money, he can't date and he [felt] hopeless about his situation." He had no suicidal ideations. Plaintiff stated he was "upset because his primary physician, (sic) and provider of his pain medication got fired and [Plaintiff] cannot get another physician in town to write his pain medications." Ms. Cook noted that Plaintiff was "correct that the other physicians in the surrounding area [were] refusing to treat patients for chronic pain, but they [were] willing to treat them/him for anything else." Ms. Cook "explained to [Plaintiff] that most physicians prefer not to treat chronic pain with medication because patients become addicted or tolerant to the medication at some point." Ms. Cook "suggested a pain management clinic to [Plaintiff] and he declined stating that he would not want to travel out of town and he knew the only thing that would help him [was] the medication." Plaintiff stated he would "wait until Dr. Boyce open[ed] his own practice." Plaintiff had not been hospitalized for mental health reasons. He stated his father "suffered from depression and alcoholism"; Plaintiff was an alcoholic who had "not drank (sic) in 8 years" (R. 1080). Plaintiff reported he had emphysema, kidney stones, a torn rotator cuff, bursitis, tendonitis, carpal tunnel syndrome, back "problems," stomach "problems," bladder "problems," "loss of function of his left foot," and chronic pain for which Dr. Boyce had prescribed Lexapro, Xanax, albuterol, Nexium, Dilantin, Remeron, Duragesic patch, Lorcet, Advair, and Spiriva.

Plaintiff stated he had completed the eleventh grade, had worked at non-skilled jobs, had not worked in ten (10) years, and was appealing a denial of his application for Social Security benefits (R. 1081).

Upon examination, Ms. Cook found Plaintiff was oriented, times four (4); his affect was blunted; his mood was labile; his speech rate and flow were normal; and his sociability was moderately withdrawn. Ms. Cook diagnosed Plaintiff with major depressive disorder "due to her (sic) history of multiple episodes of depression with the most recent episode being of moderate severity and the lack of any manic episodes" (R. 1081). Ms. Cook recommended that Plaintiff receive psychiatric evaluation "to aid in Medicaid coverage determination" (R. 1082).

Nurse Practitioner Peasak completed a Psychiatric Intake Evaluation of Plaintiff on October 11, 2006. Plaintiff lived with his mother. He stated he had "a multitude of medical problems, including chronic back pain, bilateral carpal tunnel syndrome, chronic bursitis, rotator cuff injury, as well as severe COPD . . ." since 1996. Plaintiff related his physical condition to "a couple of motor vehicle crashes and being run over by a vehicle at one point in his life." Plaintiff reported he had "done well on his meds, up until recently, when his physician quit practicing at the hospital, and he has been getting his medications intermittently." Plaintiff "describe[d] neurovegetative signs of depression, feeling depressed daily, anhedonia, some difficulty with his sleep and concentration, decreased appetite, though his weight is stable right now at 118." N.P. Peasak found Plaintiff had no "thoughts of hurting himself or" others (R. 1083). Plaintiff reported he smoked two (2) packages of cigarettes per day and had smoked since the age of five (5). Plaintiff stated he stopped drinking alcohol ten (10) years earlier and he "used to smoke marijuana on occasion." Plaintiff reported he had never been married and had no children. N.P. Peasak's mental status examination produced the following results: fair eye contact; spontaneous and unpressured speech; speech flow rate, direction,

and content were intact and appropriate; depressed mood and affect; alert and oriented times three (3); intact and unimpaired memory; average intellect; and fair judgment, insight and reliability. Plaintiff had no harmful or psychotic thoughts. N.P. Peasak assessed the following: Axis I - depression and anxiety, secondary to a medical condition of chronic pain and chronic medical conditions, "rule out recurrent depression"; pain disorder with both physiological and psychological components; opiate tolerance; benzodiazepine tolerance; nicotine dependence; history of alcohol and marijuana dependence; Axis II - "rule out Personality Disorder, NOS"; Axis III - as above; Axis IV - psycho-social stressor, including limited support system, chronic medical problems, and chronic pain; and Axis V – GAF of fifty-five (55). N.P. Peasak wrote that he would prescribe Plaintiff his "meds as noted above, other than the pain medication"; however, N.P. Peasak "[gave] him 20 Lorcet" (R. 1084). N.P. Peasak ordered blood work and instructed Plaintiff to continue case management and therapy through United Summit Center (R. 1085).

On October 18, 2006, orthopedic specialist Dr. John P. Galey examined Plaintiff for right shoulder pain and left carpal tunnel syndrome. Plaintiff reported he had a history of kidney stones, back pain, a "sore shoulder," and carpal tunnel at the left wrist. Plaintiff reported that his "primary care physician used to give him painkillers all the time, but now he can't get them because he left." Dr. Snead had injected Plaintiff's shoulder in the past, which "help[ed] . . . a little bit." Plaintiff was in no acute distress. He had no right shoulder atrophy; he had tenderness in the subacrominal region. Plaintiff had "very mild[] pain" with motion. Plaintiff's left hand revealed "normal thenar atrophy." He had negative Tinel at the wrist. Dr. Galey diagnosed right rotator cuff tendonitis. Dr. Galey found Plaintiff "may or may not have carpal tunnel syndrome, but he did say that he had nerve conduction

studies, which confirmed that." Dr. Galey injected Plaintiff's shoulder with Depo-Medrol and Xylocaine (R. 1069).

Ami Cook completed a Review Assessment of Plaintiff on November 14, 2006. She noted Plaintiff presented with moderate depression and anxiety, "both of which have remained stable over last 90-day period." Ms. Cook wrote that Plaintiff "agreed to continue pharmacological management but [was] still unwilling to attend therapy." Plaintiff stated that "his medical problems [were] far too intense for him to attempt to concentrate on anything." He was "unreceptive to CM's suggestions of how therapy may help to take his mind off of the pain or think more clearly." Plaintiff "complain[ed] that he [was] still unable to find another physician who [was] willing to write his prescriptions." Ms. Cook found Plaintiff's mood was dysphoric; his affect was anxious; his speech rate and flow were normal; his thought process was goal oriented; and he was moderately withdrawn (R. 1086).

Dr. Kenneth Kline examined Plaintiff on November 16, 2006, for "lots of pain." He found Plaintiff's lungs were clear. Neurologically, his reflexes were equal and he had equal motor strength. Plaintiff had "multiple trigger points on his back and palpable muscle spasm characteristic with the fibromyalgia type syndrome." Plaintiff had shoulder pain with extension. He had a negative straight leg raising test. Plaintiff had arthritic "changes" in his right knee. Dr. Kline found Plaintiff "basically [had] a persistent depression, possible just secondary to chronic pain from his upper back and muscle spasm. . . . [I]t has turned into a fibromyalgia-type syndrome (sic) associated with this is insomnia" (R. 1070). "He was injected trigger points." Dr. Kline prescribed Desyrel to "enhance" Plaintiff's sleep. He prescribed Zanaflex as an antispasmodic. Dr. Kline stated the "main goal [was] . . . to improve his sleep cycle to let Mother Nature work on these muscles." He prescribed an infrared heat lamp for Plaintiff to apply to his back twice daily. He was instructed to stop smoking (R. 1071).

On November 22, 2006, Nurse Practitioner Peasak completed a medication evaluation of Plaintiff. Plaintiff reported he lived with his mother. He medicated with Remeron, Lexapro, and Xanax. Plaintiff reported having "some difficulty" with sleep and continued "difficulty with pain, mood lability, and depression." Plaintiff reported he was not eating or sleeping. N.P. Peasak's mental status examination showed Plaintiff was "of thin, frail stature." His eye contact was fair; his speech was spontaneous and unpressured; his speech flow rate, direction, and content were intact and appropriate; his mood and affect were depressed; he had no harmful or psychotic thoughts. He was assessed with depression and anxiety, secondary to pain and medical conditions; pain disorder; opiate tolerance; benzodiazepine tolerance; nicotine dependence; and a history of alcohol and marijuana dependence. N.P. Peasak noted that recurrent depression and personality disorder should be ruled out. N.P. Peasak prescribed albuterol, Remeron, Lexapro, and Xanax; provided samples of Zyprexa; and instructed Plaintiff to continue case management and therapy with United Summit Center (R. 1087).

On January 17, 2007, Nurse Practitioner Peasak completed a medication evaluation of Plaintiff. Plaintiff stated he lived with his mother. He had difficulty with pain. His sleep had "improved." He was "[s]till doing well with Zyprexa for his mood, appetite, and sleep disturbance." Plaintiff reported he continued to "look for a doctor." It was noted that Dr. Boyce was "getting ready to open back up here . . . . So that should alleviate all of our problems." Plaintiff's speech was spontaneous and unpressured with intact and appropriate flow rate, direction, and content. His mood and affect were depressed. He was diagnosed with depression and anxiety, secondary to pain. N.P. Peasak prescribed Remeron, Lexapro, Xanax, and Zyprexa (R. 1094).

On February 12, 2007, it was noted at United Summit Center that Plaintiff's moderate depression, anxiety, withdrawal, paranoia, poor concentration, blunted affect, hopelessness, agitation,

low energy, loss of appetite, loss of sleep, and loss of interest had remained stable for the past ninety (90) days. It was noted that Dr. Kline was going to refer Plaintiff to a rheumatologist or a pain clinic. Plaintiff was dysphoric, his affect was blunted, his sociability was moderately withdrawn, and he was agitated. Plaintiff's speech rate and flow were normal; his thought content was within normal limits; his judgment and insight were fair; he was "oriented 4/4"; and he was cooperative (R. 1973).

Nurse Practitioner Peasak conducted a medication evaluation of Plaintiff on February 13, 2007. Plaintiff medicated with Remeron, Lexapro, Xanax, and Zyprexa from a "psychiatric perspective." Plaintiff reported he still had "difficulties" with pain. He slept "better" and his mood was "better." N.P. Practitioner Peasak noted Plaintiff "continu[ed] to look for a primary physician. Dr. Klein felt he was out of his league." Plaintiff had been referred to a pain clinic and a rheumatology clinic. N.P. Peasak noted that "[a]pparently, at some point, he has been diagnosed with fibromyalgia." Upon mental status examination, N.P. Peasak found Plaintiff's speech was spontaneous and unpressured with appropriate flow, rate, direction and content. Plaintiff's mood and affect were depressed. He had no harmful or psychotic thoughts. His appetite and sleep continued to approve. N.P. Peasak diagnosed Plaintiff with depression and anxiety, secondary to pain. N.P. Peasak continued prescriptions for Plaintiff's "psychiatric medications and his medical issues." He instructed Plaintiff to continue with case management and therapy through United Summit Center (R. 1075).

Plaintiff's March 8, 2007, chest x-ray showed "no gross signs of acute infiltrates or signs of failure in this patient with old granulomatuous disease" (R. 919).

Nurse Practitioner Peasak completed a medication evaluation of Plaintiff on March 14, 2007. Plaintiff reported he continued to experience pain, but his mood and sleep were "better." Plaintiff reported he "saw" a gastroenterologist earlier in the day and he had an appointment with a

rheumatologist in May. Upon examination, N.P. Peasak found Plaintiff was thin, frail and uncomfortable. His speech was spontaneous and unpressured with appropriate flow, rate, direction, and content. Plaintiff's mood and affect remained depressed; he had no harmful or psychotic thoughts. N.P. Peasak diagnosed depression and anxiety, secondary to pain, and he refilled Plaintiff's prescriptions for Remeron, Lexapro, Xanax, and Zyprexa (R. 1076).

Plaintiff presented to N.P. Peasak on May 9, 2007, for depression and anxiety, secondary to pain. Plaintiff reported he continued to live with his mother. Plaintiff stated that "[p]sychiatrically, he [was] doing okay." His mood and sleep were better. Plaintiff stated pain "taunts" him. It was noted that Dr. Boyce had "re-open[ed] in Richwood" and that Plaintiff would "probably follow with him, as he did before, and discontinue services here." N.P. Peasak found Plaintiff was uncomfortable; speech was spontaneous and unpressured; content was appropriate; mood and affect were depressed; and sleep and appetite were "okay." N.P. Peasak diagnosed depression and anxiety, secondary to pain. He refilled Plaintiff's prescriptions for Remeron, Lexapro, Xanax, and Zyprexa. Plaintiff was instructed to continue case management and therapy with United Summit Center. N.P. Peasak's "plan" for Plaintiff concluded with: "He may return in a couple of months, but if he gets back with Dr. Boyce, I doubt it." (R. 1077). Plaintiff's treatment at United Summit Center was terminated on May 9, 2007 (R. 887).

Plaintiff reported to Richwood Area Community Hospital on May 11, 2007, with "questions for a new physician." Plaintiff stated Dr. Boyce had treated him earlier for back pain. Plaintiff reported he had been diagnosed with fibromyalgia. He stated he was depressed and anxious. He continued to fall asleep with a lit cigarette and continued to burn himself (R. 1088). Plaintiff was diagnosed with chronic pain due to fibromyalgia, myofascial pain syndrome, COPD, tobacco

dependence, depression and anxiety. Plaintiff underwent high velocity, low amplitude ("HVLA") spinal manipulation and osteopathic manipulation ("OMT"). (R. 1089).

On June 12, 2007, Plaintiff presented to Richwood Area Community Hospital for refills of his prescription medication. Plaintiff stated he "threw his back out" while mowing. He stated he had "lost" his Medicaid coverage one (1) month earlier but "got it back." Plaintiff stated he was not sleeping well and had not gotten the prescription for Lunesta filled. He reported he continued to fall asleep with a lit cigarette (R. 1090). Plaintiff was diagnosed with depression, COPD, osteoarthritis, gastritis, and insomnia. Plaintiff underwent OMT and was instructed to stop smoking (R. 1091).

Plaintiff was examined at Richwood Area Community Hospital Rural Health Clinic on July 2, 2007. He stated he ached "all over," and was not sleeping well. He had chest pain, difficulty breathing, a cough, and abdominal pain. He had multiple cigarette burns and he "still [fell] asleep" with cigarettes (R. 898). He was diagnosed with COPD, insomnia, and tobacco dependence (R. 899).

On July 12, 2007, Plaintiff was examined at Richwood Area Community Hospital for back pain "plus pain all over." Plaintiff reported bilateral shoulder pain and right carpal tunnel syndrome symptoms. Plaintiff stated he could not sleep due to back and shoulder pain. He stated he could not "tolerate NSAIDs" due to "severe dyspepsia." Upon examination, Plaintiff was positive for sore throat, nasal drainage, cough, difficulty breathing, chest pain, abdominal pain, nausea, vomiting, diarrhea, and multiple cigarette burns. He smoked three (3) packages of cigarettes per day. Plaintiff reported no seizure activity (R. 1092). Plaintiff was diagnosed with severe COPD, insomnia, and tobacco dependence and was prescribed Lorcet and underwent OMT (R. 1093).

On July 26, 2007, Plaintiff presented to Richwood Area Community Hospital Rural Health Clinic with complaints of severe pain in his back and shoulders; he was "hurting all over." Plaintiff

reported the injection to his joint did not "help." Plaintiff had a cough. He smoked three (3) packages of cigarettes per day. He had had no seizures. His sleep had improved. Plaintiff was diagnosed with COPD and tobacco abuse; he was instructed to stop smoking (R. 897).

On August 9, 2007, Plaintiff presented to Richwood Area Community Hospital Rural Health Clinic with complaints of back and shoulder pain and his neck "bothering" him. Plaintiff reported he smoked two (2) to two-and-one-half (2 ½) packages of cigarettes per day. He had fallen asleep with a lit cigarette; he slept with a fire extinguisher beside his bed. He was diagnosed with COPD (R. 896).

On September 11, 2007, Plaintiff presented to Richwood Area Community Hospital Rural Health Clinic with complaints of being "sore all over" and to request refills of his prescription medications. Plaintiff stated he thought he had another kidney stone and his breathing was "still bad." Plaintiff stated he had shoulder pain. He was diagnosed with myofascial pain syndrome, insomnia, and COPD. He was prescribed Restoril and Lorcet. Plaintiff was instructed to stop smoking (R. 895).

On October 17, 2007, Plaintiff presented to Richwood Area Community Hospital Rural Health Clinic with complaints of shoulder, foot, back, and leg pain. Plaintiff stated that cooler weather increased his pain. Plaintiff reported he continued to have flank pain. Plaintiff had no seizure activity. He had difficulty sleeping. Plaintiff smoked two- and-one-half (2½) packages of cigarettes per day; he fell asleep with lit cigarettes. Plaintiff was diagnosed with COPD and myofascial pain syndrome. He was instructed to, at "least," reduce tobacco use (R. 894).

On November 6, 2007, Plaintiff presented to Richwood Area Community Hospital Rural Health Clinic with complaints of lower back pain and to request refills of his prescription medications. Plaintiff stated he had had no seizures. He requested an evaluation for COPD. He reported having headaches. His epigastric pain was improving. Plaintiff reported he smoked two-and-one-half (2½)

packages of cigarettes per day. He got up ten (10) to fifteen (15) times per night to smoke and he fell asleep with lit cigarettes. Plaintiff was diagnosed with myofascial pain syndrome, generalized anxiety disorder, and COPD. He was prescribed Lorcet and Xanax and instructed to stop smoking (R. 893).

Plaintiff's November 14, 2007, ventilatory function test showed he had mild COPD (R. 853).

On November 14, 2007, Dr. Sabio completed a consultative examination of Plaintiff. Plaintiff's chief complaints were for COPD, carpal tunnel syndrome, and torn rotator cuff of the right shoulder. Plaintiff reported he had experienced shortness of breath for fifteen (15) years. His ambulation was not impaired "as long as he [was] walking on level ground and he maintain[ed] a normal pace." He coughed and wheezed. Plaintiff reported he smoked two-and-one-half (2½) packages of cigarettes per day and had since he was nine (9) years old (R. 841). Plaintiff stated he had carpal tunnel syndrome in both wrists (R. 841-42). Plaintiff reported he had a torn rotator cuff, bursitis, and tendonitis in his right shoulder. Plaintiff stated he had a history of seizures when he was seventeen (17) years old, which he then treated with Dilantin and had "not had any seizures since then." Plaintiff reported he medicated with Dilantin, Remeron, Lexapro, Flexeril, Lunesta, albuterol, Spiriva, Advair, Xanax, Theo24, HCTZ, Protonix, Lorcet, Carafate, and Topamax (R. 842).

Upon examination, Plaintiff was alert and oriented as to time, place and person. His gait was normal; he was stable at station. Plaintiff weighed one-hundred-forty (140) pounds. Dr. Sabio found Plaintiff's HEENT, neck, cardiovascular, chest, abdomen, and spinal examinations were normal (R. 843). Dr. Sabio found Plaintiff had COPD from smoking. Plaintiff's Phalen's and Tinel's signs were negative; he had no hand numbness. Plaintiff had right hand grip weakness due to pain in the right shoulder. Plaintiff's neurological examination was normal. His sensory and motor functions were normal. His deep tendon reflexes were normal. He had no muscle atrophy or weakness. Plaintiff had

right shoulder tenderness and restriction of motion in both shoulders "to only 150 degrees of abduction and 160 degrees of forward flexion." Plaintiff had no swelling, redness, or effusion in either shoulder or in any joint of the upper or lower extremity (R. 845). Dr. Sabio diagnosed chronic right shoulder rotator cuff tendonitis, chronic back pain, COPD, carpal tunnel syndrome "by history," tobacco abuse and seizure disorder (R. 844).

Dr. Sabio also completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) of Plaintiff on November 14, 2007. He found Plaintiff could lift up to ten (10) pounds frequently and twenty (20) pounds occasionally. Plaintiff could frequently carry up to ten (10) pounds and occasionally carry up to twenty (20) pounds. Dr. Sabio found these limitations were supported by his diagnosis of chronic right should tendonitis, weak right hand grip, and COPD (R. 846). Dr. Sabio found Plaintiff could sit for four (4) hours at a time, stand for two (2) hours at a time, and walk for two (2) hours at a time. Dr. Sabio found Plaintiff could sit for six (6) hours in an eight (8) hour workday, stand for four (4) hours in an eight (8) hour workday, and walk for four (4) hours in an eight (8) hour workday (R. 847). Dr. Sabio found Plaintiff could never reach overhead with either hand, occasionally reach in all directions with both hands, frequently handle with both hands, continuously finger and feel with both hands, and occasionally push/pull with both hands. Dr. Sabio supported his hand assessment of Plaintiff by noting his diagnosis of rotator cuff tendonitis, torn rotator cuff, and "tender and stiff shoulders with limited abduction and flexion." Dr. Sabio found Plaintiff could continuously operate foot controls with both feet (R. 848). Dr. Sabio found Plaintiff could continuously balance; frequently climb stairs and ramps, stoop, kneel, and crouch; occasionally crawl; and never climb ladders or scaffolds due to his right shoulder chronic rotator cuff tendonitis and stiff shoulders with limited ranges of motion. Plaintiff had no hearing or vision limitations (R. 849). Dr.

Sabio found Plaintiff could continuously be exposed to moving mechanical parts, humidity and wetness, dust, odors, fumes, pulmonary irritants, and vibrations; could occasionally be exposed to unprotected heights and extreme cold; and could never be exposed to extreme heat or operate a vehicle due to chronic rotator cuff tendonitis, stiff shoulders and COPD (R. 850). Dr. Sabio found Plaintiff could perform activities, such as shopping; could ambulate without assistive devices; could walk a block at a reasonable pace on "rough or uneven surfaces"; could use public transportation; could climb a few steps at a reasonable pace; could prepare simple meals and feed himself; could care for his personal hygiene; and could sort, handle and use paper files (R. 851).

Dr. Boyce prescribed Lyrica to Plaintiff on December 4, 2007, for fibromyalgia (R. 913).

On January 6, 2008, Plaintiff was seen at the Richwood clinic for follow up and refills of his medications (R. 892). He stated that his back was bothering him and his breathing was "about the same." He was still smoking at night and falling asleep at night while smoking, and, in fact, slept with a fire extinguisher close by. He was still smoking 2 ½ packs of cigarettes a day. He was diagnosed with COPD and was told to "stop smoking Please" (several underlines in original for emphasis).

The previous Administrative Hearing was held on January 16, 2008 (R. 1138). During that hearing, counsel conceded that there had been several pulmonary function studies in the file "that showed almost no limitations." Counsel argued, however, that the latest test was taken while Plaintiff was on inhalers, two or three different lung medications, and home oxygen. "In other words, he was very heavily medicated at the time that he took that pulmonary function study, and it's nowhere near a baseline study." (R. 1148). The following discussion then took place:

ATTY:      The reason that he is on home oxygen was that Dr. Boyce had an overnight pulse oximetry study done in January of '05, and that showed that during sleep that his blood

oxygen dropped down into the '80s. And it was on the basis of that, that Dr. Boyce prescribed the home oxygen. And so he was supposed to use it at night for nine hours . . . but he cannot do that. And, so, he uses off and on during the day.

ALJ:        Why can't he do it?

ATTY:       Because he is a heavy smoker and has been unable to stop, and he falls asleep and wakes up and smokes half awake and burns himself, and he's afraid he'll blow himself up with the oxygen. And so - -

ALJ:        That's quite possible.

ATTY:       Right, and so he has seriously tried to quit, and I think the record shows he has made sincere efforts, and he is still trying but, he's been smoking since he was in elementary school.

(R. 1148).

The ALJ entered an unfavorable decision on September 19, 2008 (R. 55). On September 24, 2008, Plaintiff requested review of the decision by the Appeals Council.

**Evidence Submitted After the Prior ALJ Decision**

On September 9, 2008, Plaintiff was "seen for check-up" as a new patient at Braxton Health Associates. He stated he had shortness of breath and chronic kidney stones. Plaintiff reported he smoked two-and-one-half (2½) packages of cigarettes per day (R. 925).

On September 10, 2008, Plaintiff presented to Braxton Health Associates and was diagnosed with COPD, tobacco abuse, and bipolar disorder due to the "brutal murder [of his] girlfriend." It was noted that Plaintiff's myalgia was "prob[ably] fibromyalgia." His dose of Cymbalta was increased. He was prescribed Crestor, Soma, Flomax, and hydrocodone (R. 925).

Plaintiff's September 10, 2008, pulmonary function report showed borderline airway obstruction (R. 939). Cervical spine and right shoulder x-rays were normal (R. 926).

Plaintiff's September 10, 2008, blood work showed he was positive for benzodiazepines, opiates, TCA and THC (R. 928).

Plaintiff's September 19, 2008, thyroid ultrasound was normal (R. 930-31). Plaintiff presented to Braxton Health Associates on October 1, 2008 with complaints of depression and PTSD. He stated he had neuropathy, emphysema, and abused tobacco. Plaintiff stated he medicated with Cymbalta, clarithromycin, Flagyl, Protonix, Lyrica, Soma, and Flomax (R. 924).

Plaintiff presented to Braxton Health Associates on November 5, 2008, with complaints of body aches and pains. He stated his depression had somewhat improved with Cymbalta. He stated his PTSD was a result of his girlfriend's murder. He stated he had kidney stones and bipolar disorder. His Lyrica and Lorcet doses were increased. Plaintiff refused to seek psychiatric treatment (R. 924).

Dr. Given completed a physical examination of Plaintiff on November 5, 2008. Plaintiff reported neither Lyrica nor Cymbalta "help[ed] the fibromyalgia," but Cymbalta "helped . . . outlook, mental disposition" and he had been "a little more active than usual." Plaintiff medicated with Advair inhaler, albuterol inhaler, Carafate, Cymbalta, Dilantin, HCTZ, Lorcet, Lyrica, Protonix, Remeron, Soma, Spiriva, Theo 24, Xanax, and oxygen. Plaintiff reported no recent "history" of weakness, fatigue, fever, chills, night sweats or fainting (R. 951). Plaintiff's skin, head, eye, ear, nose, mouth, throat, neck, and endocrine examinations were normal (R. 952-53). Plaintiff complained of "inhalant exposure." He stated he had "sharp," chest pain. Plaintiff's heartburn was relieved by Protonix. He had flank pain, secondary to a kidney stone. Plaintiff stated he had widespread, muscular pain, joint stiffness, and low back pain. Plaintiff described his pain as "incapacitating, aggravated by movement,

aggravated by sitting, and aggravated by standing." Plaintiff stated his last seizure was in 2006. He stated he had chronic depression, secondary to the "brutal stabbing/murder of his girlfriend and girlfriend's mother ." Plaintiff informed Dr. Given he had insomnia (R. 952). Plaintiff stated he was frequently irritated. He last abused alcohol in 2007. Plaintiff last used cocaine, heroin, and marijuana in 2000. Plaintiff stated he worried about everything. His "mania/depression – controlled with a specific med: remeron." Plaintiff drank twelve (12) cups of soft drinks daily; he smoked two- and-one-half (2½) packages of cigarettes per day. He was single; he never drank alcohol (R. 953). Plaintiff weighed one-hundred, thirty-five (135) pounds. His blood pressure was 100/70 (R. 954).

Upon examination of Plaintiff, Dr. Given found the following: underweight; diminished breath sounds; tenderness of his "entire cervical spine"; parathoracic muscular spasms and point tenderness; paralumbar muscular spasms, point tenderness, diminished forward bending; tenderness in the sacrum; point tenderness in the coccyx; bilateral shoulder tenderness; bilateral elbow tenderness; knee pain; "palpable knots over arm muscles and back"; anxious; and depressed (R. 954-55). Dr. Given found Plaintiff's S1 joints had no point tenderness and full ranges of motion. Plaintiff had full range of motion of both hands. His hips had no tenderness, no crepitations, no swelling and full range of motion. Plaintiff's cranial nerves were intact. His deep tendon reflexes were normal "and equally reactive bilaterally." Plaintiff had good muscular coordination and strength, bilaterally. Plaintiff had no gross sensory deficits. Dr. Given diagnosed "bipolar affective disorder, depressed, in partial or unspecified remission"; "unspecified anxiety state"; "tobacco abuse, nondependent, use disorder"; "unspecified bronchitis, chronic"; "calculus in urethra"; "unspecified whether generalized or localized, osteoarthrosis, other specified sites"; "pain in soft tissues of limb"; myalgia; myositis; and depressive disorder, "not elsewhere classified." Dr. Given ordered lab work. He prescribed Lyrica

and hydrocodone. He provided samples of Soma to Plaintiff and noted he would get it "authorized" if it "help[ed] fibromyalgia." Dr. Given also noted Plaintiff had been "in and out of therapy since girlfriend's murder and [did] not wish to see anyone" (R. 955).

Plaintiff's November 6, 2008, test for rheumatoid arthritis was normal (R. 938).

Plaintiff was treated for a reaction to Cymbalta by Dr. Guy Leveaux at Braxton County Memorial Hospital Emergency Department on November 23, 2008. Plaintiff reported he had stopped taking Lexapro and had started taking Cymbalta and he could not tolerate the drug. He experienced "excessive temper" and had hit a wall. Plaintiff stated he was "more irritable" and took more Xanax when he medicated with Cymbalta. Plaintiff stated his chief complaint was depression, which was "sudden" and moderate. Plaintiff stated his situational problem was he had lost his spouse in a stabbing. Plaintiff stated he had PTSD. It was determined he was an "uncertain risk" for suicide because he was a male, was depressed, abused drugs, had no spouse, and had frightened his friends and family (R. 914). Dr. Leveaux ordered Plaintiff to stop taking Cymbalta and "use Xanax." Dr. Levaux told him to make an appointment with Dr. Given (R. 915-16).

Plaintiff was treated at Braxton Health Associates on November 26, 2008, for follow-up to his November 23, 2008, emergency room visit. Plaintiff stated that Cymbalta made him "go into a rage" and it had taken nineteen (19) Xanax to "calm down." Plaintiff stopped taking Cymbalta and felt better. He requested that he be prescribed Lexapro. He said he did not recall going to the hospital on November 23, 2008. Plaintiff was pleasant and answered questions appropriately. He had no suicidal ideations. His eyes were clear. He had a mild bruises and tender ribs. He stated he had been in an altercation. He was diagnosed with bipolar and anxiety. He was prescribed Lexapro and referred to counseling (R. 923).

39

On February 26, 2009, Plaintiff presented to Braxton Health Associates for a "check-up." He was prescribed Lexapro; he was diagnosed with depression, hypertension, and COPD (R. 933).

Plaintiff presented to Braxton Health Associations for a follow-up examination on April 7, 2009. He had no new complaints. His hypertension and COPD were controlled with medications. Plaintiff received an injection in his left shoulder. Blood work was ordered. He was prescribed Lexapro and diagnosed with hypertension, COPD, bursitis and depression (R. 932).

On April 15, 2009, the Appeals Council remanded the case to the ALJ (R. 55).

Plaintiff's May 7, 2009, cervical spine x-ray and right shoulder x-ray were normal (R. 926).

Plaintiff did not attend his June 4, 2009, appointment at Braxton Health Associates. He presented on July 7, 2009, with thumb pain and a sore throat. He was diagnosed with depression and anxiety. An x-ray was ordered and his medications were continued. Plaintiff rescheduled his August 7, 2009, appointment at Braxton Health Associates (R. 932).

Plaintiff's July 7, 2009, blood work showed his cholesterol was high. On the lab report, it was noted that Plaintiff had been drinking and not taking his medications and that Plaintiff needed to stop drinking and take his medication. Plaintiff was notified, on July 20, 2009, to stop drinking (R. 936).

Dr. Doug Given completed a Primary Care Physician Questionnaire of Plaintiff on July 23, 2009. He noted he had been Plaintiff's treating physician since September, 2008. Dr. Given noted Plaintiff's medical history included COPD, hypertension, anxiety, depression, PTSD, fibromyalgia, tobacco abuse, high cholesterol, arthritis, osterarthritis, hypoglycemia, kidney stones, and seizures (R. 942). Dr. Given noted that he based the diagnoses on Plaintiff's blood pressure, lab results, and x-rays (R. 943). Dr. Given opined that Plaintiff could not perform sedentary, light, medium, or heavy activity (R. 944). Dr. Given found Plaintiff must alternate positions occasionally and frequently. Dr. Given

opined that Plaintiff needed a sit/stand option at intervals of thirty (30) minutes at Plaintiff's option. Plaintiff could sit, stand and/or walk for thirty (30) minutes at a time. Dr. Given opined Plaintiff would be able to "be up on his[] feet" for a total of four (4) hours in an eight (8) hour work day; Plaintiff would be able to sit upright, in a regular chair, for four (4) hours in an eight (8) hour work day (R. 945). Dr. Given found it was "advisable" for Plaintiff to recline or lie down daily with his feet up and to have frequent rest periods from work. Dr. Given opined Plaintiff would require regular rest periods, every thirty (30) minutes, and as needed. Dr. Given found Plaintiff could never climb, balance, kneel, crawl, or squat. He found Plaintiff could infrequently stoop, bend, crouch, stretch and reach (R. 946). Dr. Given found Plaintiff should avoid concentrated exposure to noise and environmental hazards; he should avoid all exposure to machinery, jarring, vibrations, excessive humidity, cold or hot temperatures, fumes and dust. Plaintiff would experience mild to moderate chronic pain and severe intermittent pain. Dr. Given found Plaintiff did not require the use of assistive devices in ambulating (R. 947). Dr. Given found Plaintiff could use both feet to push/pull (R. 948). Plaintiff could use his hands for repetitive or prolonged grasping, handling, arm controls, fine manipulation, and fingering; he had no loss of grip strength in either hand. Plaintiff was able to sit upright for prolonged periods of time with his head in a forward flexed position. Dr. Given found Plaintiff's impairments would "likely cause absence from a regular job"; he did not make findings as to the number of absences. Dr. Given found Plaintiff had "'functional overlay'" (R. 949). Dr. Given found Plaintiff was incapable of performing any full-time job and had been incapable of performing a full time job from January 14, 2004, to the date of the completion of the questionnaire (R. 950).

Mark Haut, Ph.D., completed nuropsychological testing of Plaintiff on August 13, 2009. Plaintiff stated he had chronic pain, fibromyalgia, arthritis, COPD, and a history of seizures. Plaintiff

stated he was unsure if he had hypertension. Plaintiff stated he experienced "continuing ongoing severe symptoms of depression . . . ." Plaintiff reported he had PTSD and anxiety. Plaintiff stated he had difficulty with concentration and short-term memory. He could watch thirty (30) minute situation comedies on television; he could not "follow" movies. Plaintiff stated his girlfriend had been murdered. He drank once weekly (R. 989).

Dr. Haut administered the following tests to Plaintiff: "21-Item Test, Test of Memory Malingering, Motor/Sensory examination, Controlled Oral Word Association Test, Animal Naming Test, Boston Naming Test, Stroop Color Word Test, Trail Making Test, Digit Symbol Subtest of the WAIS-III, Digit Span Subtests of the ASI-III, Auditory Consonant Trigrams, California Verbal Learning Test-II, Logical Memory and Visual Reproduction Subtests of the WMS-R, Rey-Osterrieth Complex Figure, Wisconsin Card Sorting Test, Similarities Subtests of the WASI-III, clinical interview, Beck Anxiety Inventory, and Beck Depression Inventory." Plaintiff's affect was "clearly restricted." Dr. Haut found "on measures used to detect embellishment of symptoms, he scored above the cut off from poor effort or malingering." Plaintiff recognized thirteen (13) out of twenty-one (21) objects on the 21-Item Test. He scored a "perfect" fifty (50) on the Test of Memory Malingering. Plaintiff's motor examination "revealed intact strength of grip with no pronator drift, but decreased rapid alternating movements." Plaintiff's simple, repetitive drawings were intact; he could learn a new motor sequence. His Praxis was intact. "He had no extinctions to simple and complex double simulating tactile stimulation." Plaintiff's visual fields were "full to confrontation and without extinctions to double simultaneous stimulation." Plaintiff had no hemispatial inattention on line bisection or difficulty with right/left orientation. Plaintiff's "spontaneous speech was fluent and free of paraphasic errors with intact comprehension of three step conditional commands and repetition of

atypical phases." His fluency was intact for "phonemes, but mildly reduced for semantics." Plaintiff

had "no evidence of confrontation naming problems" (R. 990). Plaintiff's general cognitive efficiency

was severely slowed (R. 990-91). Plaintiff's visual tracking and motor response speeds were mildly

impaired. Plaintiff's speeded visual motor integration was moderately slowed. Plaintiff's auditory

attention span showed he had mild difficulty sustaining focus and a "mild problem" with auditory

interference. Plaintiff's verbal learning through repetition showed a positive learning curve, but "it

was reduced overall." Plaintiff had "moderate retrieval problems over time" and "mild retrieval

problems . . . with recall of complex organized verbal information." Plaintiff's memory for simple

visual information was intact; his memory for complex visual information was moderately impaired.

His verbal reasoning skills were low average and he had mild to moderate difficulties with visual

problem solving. Plaintiff had reduced conceptualization and perseverative responding (R. 991).

Dr. Haut found Plaintiff was experiencing mild to moderate cognitive deficits, which included

difficulty with attention; processing; and frontal lobe signs with decreased problem solving,

perseveration, and stimulus-bound responding. Dr. Haut found the etiology of Plaintiff's deficits was

COPD, chronic pain, and ongoing depression and anxiety. Dr. Haut found Plaintiff met listing 12.02

for organic mental disorder, 12.04 for affective disorder, 12.06 for anxiety disorder. He noted Plaintiff

had treated his conditions with "appropriate" medication for years and the conditions "appear[ed] to

be treatment resistant at this point." Dr. Haut found Plaintiff had marked restrictions in his

socialization and based this finding on his clinical interview with Plaintiff and Plaintiff's "PTSD-like"

anxiety disorder. Dr. Haut found Plaintiff had "moderate problems with his attention and frequent

difficulties with pace." He based these findings on Plaintiff's results on the Digit Symbol test. Dr.

Haut found Plaintiff had repeated episodes of deterioration "in a work-like setting." He based this

finding on his clinical interview with Plaintiff (R. 991). Dr. Haut found Plaintiff's alcohol use "influence[d] some of his cognitive functions . . . [and] worsen[ed] his anxiety and depression"; he did not think it "account[ed] for the majority of [Plaintiff's] symptoms and limitations" (R. 991-92).

Dr. Bennet Orvik completed a West Virginia Disability Determination Service consultative examination of Plaintiff on August 14, 2009. Plaintiff reported he quit working in 1996 due to a breathing "problem," which was his chief complaint. Plaintiff reported he had fibromyalgia. Dr. Orvik noted Plaintiff had not "seen a rheumatologist" (R. 969) Plaintiff stated he had a right shoulder rotator cuff tear and was told by an orthopedic surgeon that "the tear was too severe to do anything about . . ." (R. 969-70). Plaintiff stated he had a seizure disorder, bilateral carpal tunnel syndrome, and depression. Plaintiff reported the depression medication "help[ed] to certain extent." Plaintiff stated his breathing became worse when the weather was humid; his fibromyalgia was exacerbated by hot or cold weather. Plaintiff stated all his muscles and joints hurt. He described his pain as constant and "aching"; he had no radiation. Plaintiff stated his pain was exacerbated by "increasing activity" but hydrocodone and "muscle spray" "help[ed] to certain extent." Plaintiff reported he had been seizure free for two (2) years (R. 970). Plaintiff took the following medications: phenytoin, pantoprazole, alprazolam, cyclobenzaprine, Lexapro, Advair, hydrocodone, mirtazapine, Spiriva, albuterol, and hydrochlorothiazide (R. 970-71). Plaintiff stated he smoked two-and-one-half (2½) packages of cigarettes per day and had smoked for thirty (30) years. Plaintiff reported he "occasionally" drank "in large amounts." Plaintiff stated he did not use marijuana. He was single. He had never married. Plaintiff lived with his mother. Plaintiff reported his father died at the age of fifty-two (52) from COPD; his mother died at the age of sixty-three (63) from COPD (R. 971).

Upon examination, Dr. Orvik found Plaintiff's appearance was "general[ly] . . . normal," except for "tattoos essentially over most of his body" (R. 971). Plaintiff weighed one-hundred-twenty-seven (127) pounds. Dr. Orvik's examination of Plaintiff's HEENT, neck, heart, extremities, and abdomen produced normal results. Dr. Orvik found Plaintiff's muscle strength in both arms and both legs were 5/5. His cranial nerves were intact. His right leg supine straight leg raising test was positive at forty-five (45) degrees; it was normal on the left. Plaintiff's straight leg raising test in the sitting position was normal, bilaterally. Plaintiff's grip strength "appeared to be mildly decreased bilaterally at 4/5"; his fine manipulation also appeared to be mildly impaired, bilaterally. Plaintiff's knee flexion, knee extension, hip motion, and ankle motion were normal, bilaterally. Plaintiff's cervical spine had thirty-five (35) degrees of lateral flexion, bilaterally; his flexion was limited to forty (40) degrees and his extension was sixty (60) degrees (R. 972). Plaintiff's rotation was seventy (70) degrees, bilaterally. His lumbar spine flexion and extension were normal. He had "no areas of joint inflammation, tenderness, swelling, or deformity." Plaintiff's motor skills, stance, and gait were normal. Plaintiff reported he occasionally used a cane. Plaintiff could tandem walk "fairly well." He could not walk on his heels or toes. He could bend to ninety (90) degrees. He could "do a full squat" and rise from a squat without difficulty. He had no difficulty getting in and out of the chair and up on and down from the examination table (R. 973).

Dr. Orvik found, based on Plaintiff's pulmonary function test, he was positive for mild obstructive lung disease and diagnosed seizure disorder, depression, GERD, and fibromyalgia "type pain," although Plaintiff had "no significant findings in this area" (R. 973, 977-80). Dr. Orvik opined that Plaintiff's treatment "appear[ed] to be appropriate for his various problems, although he [was] on a large amount of narcotic pain medication." Dr. Orvik found Plaintiff's prognosis was "definitely

guarded." Plaintiff stated he had pain after sitting for thirty (30) minutes and after standing for twenty (20) minutes. Plaintiff stated he experienced shortness of breath after walking for no more than two-hundred-fifty (250) feet. Plaintiff stated he could lift fifteen (15) pounds. He had difficulty handling objects "at times." Plaintiff drove occasionally and had to stop due to back pain (R. 973).

Dr. Orvik completed a Medical Source Statement of Ability to do Work-Related Activities on Plaintiff on August 14, 2009. Dr. Orvik found Plaintiff could occasionally carry eleven (11) to twenty (20) pounds, frequently carry up to ten (10) pounds, and occasionally carry up to twenty (20) pounds. Plaintiff's lifting and carrying were limited due to Plaintiff's back pain and COPD (R. 981). Dr. Orvik found Plaintiff could sit for thirty (30) minutes, stand for twenty (20) minutes, and walk for ten (10) minutes at one (1) time without interruption. Plaintiff could sit and/or stand for a total of three (3) hours in an eight (8) hour workday and could walk for a total of two (2) hours in an eight (8) hour workday. Dr. Orvik noted Plaintiff needed the use of a cane to ambulate; he based that finding on Plaintiff's having informed him that he occasionally used a cane (R. 982). Dr. Orvik found Plaintiff could occasionally reach overhead with both hands, occasionally reach in all other directions with both hands, frequently handle with both hands, frequently finger with both hands, continuously feel with both hands, and occasionally push/pull with both hands. He based this finding on Plaintiff's diagnosis of COPD and carpal tunnel syndrome. Dr. Orvik found Plaintiff could frequently operate foot controls, bilaterally. He based this finding on Plaintiff's statements about his back pain (R. 983). Dr. Orvik found Plaintiff could occasionally climb stairs or ramps and stoop. He could continuously balance. He could never climb ladders or scaffolds, kneel, crouch, or crawl. Dr. Orvik based this fining on Plaintiff's complaints of back pain and COPD. Dr. Orvik found Plaintiff had no hearing or visual limitations (R. 984). Dr. Orvik found Plaintiff could never be exposed to extreme cold or heat.

He could occasionally be exposed to moving mechanical parts, humidity, wetness, dust, odors, fumes, pulmonary irritants, and vibrations. Plaintiff could occasionally operate a motor vehicle. Plaintiff could frequently be exposed to unprotected heights. Dr. Orvik based his findings on Plaintiff's diagnosis of COPD and his statement that he had fibromyalgia (R. 985). Dr. Orvik found Plaintiff could travel without a companion to assist him; ambulate without using a wheelchair, two (2) crutches, two (2) canes, or walker; use standard public transportation; climb steps at a reasonable pace; prepare a simple meal and feed himself; care for his personal hygiene; and sort, handle and use paper or files. Dr. Orvik found Plaintiff could not shop or walk a block at a reasonable pace on rough or uneven surfaces. Dr. Orvik listed COPD as the medical finding that supported his opinions (R. 986).

Dr. Haut completed a Mental Residual Functional Capacity Assessment of Work-Related Abilities of Plaintiff on August 18, 2009. He found Plaintiff had no limitations in understanding, remembering, and carrying out short, simple instructions. He found Plaintiff had mild limitations in his ability to understand, remember, and carry out detailed instructions, exercise judgment, and make simple work-related decisions. He based these findings on Plaintiff's "attention problems." Dr. Haut found Plaintiff had moderate limitations in his ability to sustain attention and concentration for extended periods. Plaintiff had marked limitations in his ability to maintain regular attendance and punctuality, complete a normal workday and workweek without interruptions from psychological symptoms, and perform at a consistent pace without an unreasonable number and length of work breaks (R. 1008). Dr. Haut found Plaintiff had no limitations in his ability to maintain acceptable standards of grooming and hygiene, ask simple questions, and request assistance from coworkers or supervisors. Dr. Haut found Plaintiff had mild limitations in his ability to interact appropriately with the public, work in coordination with others without unduly distracting them, and demonstrate

reliability. Dr. Haut found Plaintiff had moderate limitations in his ability to respond appropriately to direction and criticism from supervisors, work in coordination with others without being unduly distracted by them, maintain acceptable standards of courtesy and behavior, and relate predictably in social situations in the workplace without exhibiting behavioral extremes (R. 1009). He based these findings on Plaintiff's depression and poor attention. Dr. Haut found Plaintiff had no limitation in his ability to be aware of normal hazards and take appropriate precautions; he had moderate limitations in his ability to respond to changes in the work setting or work processes. Dr. Haut found Plaintiff had mild limitations in his ability to carry out an ordinary work routine without special supervision, set realistic goals, make plans independently of others, and travel independently in unfamiliar places (R. 1010). Dr. Haut found Plaintiff had marked limitations in his ability to tolerate ordinary work stress due to the severity of his depression. Dr. Haut found Plaintiff had been unable to work from January 14, 2004, to the date of the assessment (R. 1011).

Dr. Haut completed a Psychiatric Review Technique of Plaintiff on August 19, 2009. He found Plaintiff had organic mental disorders and affective disorders (R. 933). Dr. Haut did not document any factors that supported his finding that Plaintiff had organic mental disorders (R. 994). Plaintiff's affective disorders were characterized by the presence of anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; feelings of guilt or worthlessness; difficulty concentrating or thinking; and thoughts of suicide. Dr. Haut found Plaintiff's affective disorder was major depressive disorder (R. 996). Dr. Haut then found Plaintiff had anxiety-related disorder, which was generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity, apprehensive expectation, vigilance, scanning and recurrent and intrusive recollections of a traumatic experience, which was a source of marked distress (R. 998). Dr. Haut

48

found Plaintiff had mild restrictions of activities of daily living; marked difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. Dr. Haut found Plaintiff had experienced three (3) episodes of decompensation (R. 1003). Dr. Haut did not complete the section on "'C' Criteria of the Listings" on the assessment (R. 1004).

On September 8, 2009, Dr. Given completed a Fibromyalgia Residual Functional Questionnaire on Plaintiff. Dr. Given did not make a finding that Plaintiff met the American Rheumatological criteria for fibromyalgia. Dr. Given noted Plaintiff had been diagnosed with depression, somatic dysfunction, myofascial pain syndrome, seizure disorder, chronic right shoulder rotator cuff tendonitis, chronic back pain, COPD, carpal tunnel syndrome (by history), tobacco abuse, generalized anxiety disorder, insomnia, gastritis, osteoarthritis, fibromyalgia, personality disorder, anxiety, and obstructive sleep apnea (R. 1017). Dr. Given based his diagnoses on Plaintiff's anti-nuclear antibody test being negative; his not having rheumatoid arthritis; "WSR" within normal limits; his cervical spine "film" within normal limits; and his C-spine MRI showing a disc bulge (R. 1018). Dr. Given listed Plaintiff's symptoms as multiple tender points, nonrestorative sleep, chronic fatigue, depression, numbness and tingling, frequent and severe headaches, shortness of breath, mood swings, and PTSD (R. 1018-19). Dr. Given listed the following locations of Plaintiff's tender point pain: trapezius, bilateral; lateral epicondyle, bilateral; gluteal, bilateral; upper and other quadrants of buttocks and anterior fold of muscle, bilateral; and knees, bilateral (R. 1020). Dr. Given found Plaintiff's pain was chronic, constant and moderate to severe and he experienced pain often. Plaintiff's pain was precipitated by changing weather, movement, overuse, cold and heat, and stress. Dr. Given noted that severe depression and PTSD contributed the severity of Plaintiff's symptoms and functional limitations (R. 1022). Dr. Given found Plaintiff did not malinger, and Plaintiff's reported symptoms and limitations

were reasonably consistent with his findings.   Dr. Given found Plaintiff was severely limited in his ability to deal with ordinary work stress.  Plaintiff could not walk any city blocks; he could sit, stand and walk for twenty (20) minutes at one time (R. 1023).  Dr. Given found Plaintiff required a job that permitted shifting positions, at will, from sitting, standing, or walking.  Plaintiff would need to lie down at unpredictable intervals during an eight (8) hour workday; he would require "more frequent" rest periods than usually expected.  Plaintiff would have to elevate his legs while sitting.  Dr. Given found Plaintiff did not require the use of a cane.  Dr. Given found Plaintiff could infrequently lift and carry less than ten (10) pounds and could never lift or carry ten (10), twenty (20), or fifty (50) pounds (R. 1024).  Dr. Given found Plaintiff would be significantly limited in reaching, handling or fingering due to severe pain.  Dr. Given found Plaintiff could grasp, turn, and twist objects with his hands five (5) percent of a normal workday and reach, including overhead, with his arms, less than five (5) percent of a workday.  Plaintiff could perform fine manipulations with his fingers less than five (5) percent of a normal workday.  Dr. Given found Plaintiff could bend and twist at the waist "not at all" and "infrequently" (R. 1025).  Plaintiff would be absent from work more than three (3) times per month.  Dr. Given found Plaintiff could not sustain full time work (R. 1026).

In response to a letter from Plaintiff's lawyer to Dr. Haut, the doctor wrote, on September 17, 2009, that Plaintiff's resumed consumption of alcohol did not alter his findings that, even though alcohol "would influence some of his cognitive functioning and it may also worsen his depression and anxiety," it did not "account[ ] for the majority of his symptoms and limitations."  Dr. Haut reiterated his finding that Plaintiff's "major limitations [have] to do with attention, concentration and pace" and his ability to tolerate work stress was markedly limited, neither of which would improve if Plaintiff stopped drinking (R. 1013).

On September 8, 2009, Plaintiff presented to Dr. Given for a "check up." Plaintiff reported he had been experiencing more pain due to weather changes. Nurse Practitioner Charity Woods noted Plaintiff "need[ed] papers filled out for disability" and had "no other problems at this time." Plaintiff medicated with Advair, albuterol inhaler, amoxicillin, Dilantin, HCTZ, hydrocodone, oxygen, Protonix, Remeron, simvastatin, Spiriva, Theo24, and Xanax (R. 1096). Plaintiff reported neck stiffness. He smoked two-and-one-half (2½) packages of cigarettes per day. Plaintiff stated he had experienced chest pains. Plaintiff reported his heartburn was relieved by Protonix. Plaintiff stated he experienced widespread muscular pain, joint stiffness, and lower back pain that was incapacitating and aggravated by movement, sitting, and standing. Plaintiff reported he had last had a seizure in 2006 (R. 1097). Plaintiff reported chronic depression, which was "[secondary to] brutal stabbing/murder of girlfriend & girlfriend's mother." Plaintiff stated his insomnia had improved, he was irritable, and he worried "about everything." Plaintiff stated his "mania-depression" was controlled with Remeron. He had not consumed alcohol since 2007; he had last used cocaine, heroin, and marijuana in 2000 (R. 1098). Upon examination, Dr. Given found Plaintiff's skin, eyes, ears, nose, throat, head, neck, cardiovascular system, and abdomen were normal (R. 1099-100). Plaintiff's respiratory system showed symmetrical chest expansion, bilaterally, with a normal respiratory rate and pattern. Plaintiff's lung fields were resonant, bilaterally. He had no rales, rhonchi, wheezing, or rubs. He had diminished breath sounds. There was tenderness over Plaintiff's "entire" cervical spine. Plaintiff was positive for parathoracic muscle spasms and point tenderness. Plaintiff had paralumbar muscle spasms, point tenderness, and diminished forward bending. Plaintiff had point tenderness in his sacrum and coccyx. Plaintiff's "SI joints show[ed] a full ROM without point tenderness." Plaintiff had bilateral shoulder tenderness, elbow tenderness, and bilateral knee pain. Plaintiff had "palpable knots over arm muscles

and back." Dr. Given found, upon neurological examination of Plaintiff, that he was depressed and anxious. He was "a little better with bid [C]ymbalta." Plaintiff was tearful and shaking. His cranial nerves were intact. His deep tendon reflexes were normal and equally reactive, bilaterally. Plaintiff had good muscular coordination and strength, bilaterally. He had no gross sensory deficits. Dr. Given diagnosed tobacco abuse; depressive disorder, "not elsewhere classified"; chronic, unspecified bronchitis; "[u]nspecified whether generalized or localized, osteoarthrosis, other specified sites"; myalgia; myositis; and "[p]ain in soft tissues of limb" (R. 1100).

Plaintiff was examined by Dr. Given on December 1, 2009. Plaintiff stated he was "having a great deal of fibromyalgia pain which he state[d] increase[d] in the winter." Plaintiff medicated with Advair inhaler, albuterol inhaler, Dilantin, HCTZ, hydrocodone, oxygen, Protonix, Remeron, simvastatin, Spiriva, Theo24, and Xanax (R. 1103). Upon examination, Dr. Given found Plaintiff had a rash on his abdomen and groin. Plaintiff's respiratory system showed symmetrical chest expansion, bilaterally, with a normal respiratory rate and pattern. Plaintiff's lung fields were resonant, bilaterally. He had no rales, rhonchi, wheezing, or rubs. He had diminished breath sounds. There was tenderness over Plaintiff's "entire" cervical spine. Plaintiff was positive for parathoracic muscle spasms and point tenderness. Plaintiff had paralumbar muscle spasms, point tenderness, and diminished forward bending. Plaintiff had point tenderness in his sacrum and coccyx. Plaintiff's "SI joints show[ed] a full ROM without point tenderness." Plaintiff had bilateral shoulder tenderness, elbow tenderness, and bilateral knee pain. Plaintiff had "palpable knots over arm muscles and back." Dr. Given found, upon neurological examination of Plaintiff, that he was depressed and anxious. He was "a little better with bid [C]ymbalta." Plaintiff was tearful and shaking. His cranial nerves were intact. His deep tendon reflexes were normal and equally reactive, bilaterally. Plaintiff had good muscular coordination and

strength, bilaterally. He had no gross sensory deficits. Dr. Given diagnosed scabies, myalgia, myositis, and "[o]ther and unspecified diseases of upper respiratory tract." Dr. Given prescribed Savella, a Z-pac, and Elimite cream (R. 1107).

On January 19, 2010, Plaintiff presented to Dr. Given for examination of right side body pain. Plaintiff medicated with Advair inhaler, albuterol inhaler, Dilantin, HCTZ, hydrocodone, Lidoderm patch, oxygen, Protonix, Remeron, simvastatin, Spiriva, Theo24, and Xanax (R. 1108). Plaintiff reported neck stiffness. He smoked two-and-one-half (2½) packages of cigarettes per day. Plaintiff stated he had experienced chest pains. Plaintiff reported his heartburn was relieved by Protonix. Plaintiff stated he experienced widespread muscular pain, joint stiffness, and lower back pain that was incapacitating and aggravated by movement, sitting, and standing. Plaintiff reported he had last had a seizure in 2006 (R. 1110). Plaintiff reported chronic depression, which was "[secondary to] brutal stabbing/murder of girlfriend & girlfriend's mother." Plaintiff stated his insomnia had improved, he was irritable, and he worried "about everything." Plaintiff stated his "mania-depression" was controlled with Remeron. He had not consumed alcohol since 2007; he had last used cocaine, heroin, and marijuana in 2000 (R. 1111). Upon examination, Dr. Given found Plaintiff was underweight and his skin, eyes, ears, nose, throat, head, neck, cardiovascular system, and abdomen were normal (R. 1112-113). Plaintiff's respiratory system showed symmetrical chest expansion, bilaterally, with a normal respiratory rate and pattern. Plaintiff's lung fields were resonant, bilaterally. He had no rales, rhonchi, wheezing, or rubs. He had diminished breath sounds. There was tenderness over Plaintiff's "entire" cervical spine. Plaintiff was positive for parathoracic muscle spasms and point tenderness. Plaintiff had paralumbar muscle spasms, point tenderness, and diminished forward bending. Plaintiff had point tenderness in his sacrum and coccyx. His "SI joints show[ed] a full ROM without point

tenderness." Plaintiff had bilateral shoulder tenderness, elbow tenderness, and bilateral knee pain. Plaintiff had "palpable knots over arm muscles and back." Dr. Given found, upon neurological examination, that Plaintiff was depressed and anxious. He was "a little better with bid [C]ymbalta." Plaintiff was tearful and shaking. His cranial nerves ere intact. His deep tendon reflexes were normal and equally reactive, bilaterally. Plaintiff had good muscular coordination and strength, bilaterally. He had no gross sensory deficits. Dr. Given diagnosed tobacco abuse, depressive disorder, pain in soft tissues of limbs, myalgia, myositis, and "[o]ther and unspecified diseases of upper respiratory tract." Dr. Given prescribed Lidoderm patch and injected Plaintiff hip with Lidocaine (R. 1113).

Plaintiff presented to Dr. Given on April 20, 2010, with complaints of allergy symptoms. Plaintiff had "no other new problems." Plaintiff medicated with Advair inhaler, albuterol inhaler, Dilantin, HCTZ, hydrocodone, Lidoderm patch, oxygen, Protonix, Remeron, simvastatin, Spiriva, Theo24, and Xanax (R. 1115). Plaintiff reported neck stiffness. He smoked two-and-one-half (2½) packages of cigarettes per day. Plaintiff stated he had experienced chest pains. Plaintiff reported his heartburn was relieved by Protonix. Plaintiff stated he experienced widespread muscular pain, joint stiffness, and lower back pain that was incapacitating and aggravated by movement, sitting, and standing. Plaintiff reported he had last had a seizure in 2006 (R. 1116). Plaintiff reported chronic depression, which was "[secondary to] brutal stabbing/murder of girlfriend & girlfriend's mother." Plaintiff stated he had insomnia, was irritable, and worried "about everything." Plaintiff stated his "mania-depression" was controlled with Remeron. He had not consumed alcohol since 2007; he had last used cocaine, heroin, and marijuana in 2000 (R. 1118). Upon examination, Dr. Given found Plaintiff's skin, eyes, ears, nose, throat, head, neck, cardiovascular system, and abdomen were normal (R. 1118-119). Plaintiff's respiratory system showed symmetrical chest expansion, bilaterally, with

a normal respiratory rate and pattern. Plaintiff's lung fields were resonant, bilaterally. He had no rales, rhonchi, wheezing, or rubs. He had diminished breath sounds. There was tenderness over Plaintiff's "entire" cervical spine. Plaintiff was positive for parathoracic muscle spasms and point tenderness. Plaintiff had paralumbar muscle spasms, point tenderness, and diminished forward bending. Plaintiff had point tenderness in his sacrum and coccyx. Plaintiff's "SI joints show[ed] a full ROM without point tenderness." Plaintiff had bilateral shoulder tenderness, elbow tenderness, and bilateral knee pain. Plaintiff had "palpable knots over arm muscles and back." Dr. Given found, upon neurological examination of Plaintiff, that he was depressed and anxious. He was "a little better with Lexapro." His cranial nerves were intact. His deep tendon reflexes were normal and equally reactive, bilaterally. Plaintiff had good muscular coordination and strength, bilaterally. He had no gross sensory deficits. Dr. Given diagnosed tobacco abuse, depressive disorder, myalgia, myositis, "pain in soft tissues of limb," epilepsy, "other and unspecified diseases of upper respiratory tract," and "other specified general medical condition" (R. 1119). Dr. Given prescribed Astepro (for nasal congestion) (R. 1120).

Plaintiff's April 20, 2010, laboratory results showed a reduced Dilantin level. It was noted that Plaintiff had "missed some doses" (R. 1121).

Plaintiff's May 21 and June 22, 2010, Dilantin levels were low (R. 1126-127).

On July 13, 2010, Plaintiff presented to Dr. Given for a "checkup." He had no "new problems." Plaintiff medicated with Advair inhaler, albuterol inhaler, Dilantin, HCTZ, hydrocodone, oxygen, Protonix, Remeron, simvastatin, Spiriva, Theo24, and Xanax (R. 1128). Plaintiff reported neck stiffness. He smoked two-and-one-half (2½) packages of cigarettes per day. Plaintiff stated he had experienced chest pains. Plaintiff reported his heartburn was relieved by Protonix. Plaintiff stated

he experienced widespread muscular pain, joint stiffness, and lower back pain that was incapacitating and aggravated by movement, sitting, and standing. Plaintiff reported he had last had a seizure in 2006. Plaintiff reported chronic depression, which was "[secondary to] brutal stabbing/murder of girlfriend & girlfriend's mother." Plaintiff stated he had insomnia, was irritable, and worried "about everything." Plaintiff stated his "mania-depression" was controlled with Remeron (R. 1129). He had not consumed alcohol since 2007; he had last used cocaine, heroin, and marijuana in 2000 (R. 1130).

Upon examination, Dr. Given found Plaintiff's skin, eyes, ears, nose, throat, head, neck, cardiovascular system, and abdomen were normal (R. 1131-132). Plaintiff's respiratory system showed symmetrical chest expansion, bilaterally, with a normal respiratory rate and pattern. Plaintiff's lung fields were resonant, bilaterally. He had no rales, rhonchi, wheezing, or rubs. He had diminished breath sounds (R. 1131). There was tenderness over Plaintiff's "entire" cervical spine. Plaintiff was positive for parathoracic muscle spasms and point tenderness. Plaintiff had paralumbar muscle spasms, point tenderness, and diminished forward bending. Plaintiff had point tenderness in his sacrum and coccyx. Plaintiff's "SI joints show[ed] a full ROM without point tenderness." Plaintiff had bilateral shoulder tenderness, elbow tenderness, and bilateral knee pain. Plaintiff had "palpable knots over arm muscles and back." Dr. Given found, upon neurological examination of Plaintiff, that he was depressed and anxious. He was "a little better with Lexapro." His cranial nerves were intact. His deep tendon reflexes were normal and equally reactive, bilaterally. Plaintiff had good muscular coordination and strength, bilaterally. He had no gross sensory deficits. Dr. Given made "[n]o diagnosis for this patient" or "[r]ecommendations for this patient" (R. 1132).

Plaintiff's August 5, 2010, echocardiogram showed "suboptimal study secondary to patient's poor acoustic window and body habitus." Plaintiff's left ventricle and left ventricular ejection fraction were normal. He had mild mitral regurgitation (R. 1133).

Plaintiff was examined by Dr. Given on October 14, 2010. Plaintiff complained of chronic pain. He stated his pain was "7-8 out of 10." Dr. Given noted Plaintiff had right shoulder pain, a rotator cuff tear, and fibromyalgia. Dr. Given also noted Plaintiff "had [C]ymbalta got bipolar mania. on remeron and lexapro. doing ok. has hurt 1 knuckle Saturday. thinks broke hand when intruder came thru window and he punched him. he is taking care of his mother. has been some depressed due to mother. on lorcet 10/650. on them a while has cts also." [sic]. Plaintiff medicated with albuterol, alprazolam, cyclobenzaprine, fluticas, hydrochlorthizide, phenytoin, simvastatin, theophylline, and tiotropium (R. 1134) Dr. Given found Plaintiff's active "problems" were depressive disorder, not elsewhere classified; PTSD as of July 13, 2010; bipolar I disorder, "most recent episode (or current) unspecified" and added on July 13, 2010; rheumatism, "unspecified and fibrositis"; "pure" hypercholesterolemia; unspecified urethra disorder; generalized osteoarthrosis "involving unspecified site"; glycogenosis; "other convulsions"; "unspecified essential hypertension"; chronic airway obstruction; tobacco use disorder; "rotator cuff"; and carpal tunnel syndrome (R. 1134-135). Plaintiff's symptoms included fatigue, chest pain with panic attacks, seizure because he "missed some [D]ilantin"; cough, myalgia, and arthralgias. Plaintiff's examination was normal, except for a contusion on his third hand and tender range of motion of his right shoulder. Plaintiff's strength was 5/5 in both the upper and lower extremities. His reflexes were 2/4 in both upper and lower extremities (R. 1135). Dr. Given diagnosed tobacco use disorder, "rotator cuff," carpal tunnel syndrome, depressive disorder, and chronic airway obstruction (R. 1135-136). Dr. Given prescribed tiotropium,

albuterol, fluticas, phenytoin, simvastatin, Theo24, alprazolam, cyclobenzaprine, and hydrochlorothiazide (R. 1136).

Plaintiff's November 1, 2010, x-ray of his left hand was normal (R. 1137).

**September 10, 2009, Administrative Hearing**

ALJ Alexander noted the hearing was taking place because his December 19, 2008, decision was remanded by the Appeals Council (R. 1208).

Plaintiff's counsel stated he continued to smoke "a great deal" and showed the ALJ a blanket that Plaintiff had burned as he smoked in bed. The ALJ asked if Plaintiff used oxygen at night while he smoked; Plaintiff used it only in the day even though it was prescribed specifically for night use (R. 1211-1212). Relative to oxygen use, Plaintiff testified he used it when he woke, at around 10:00 a.m., for one (1) hour, and at 3:00 p.m., for one (1) hour, and before he went to bed at night (R. 1236). Plaintiff testified there were times he used oxygen more, but he never used it less (R. 1237).

Dr. Balk testified that Plaintiff's severe medical impairments were COPD, chronic pain syndrome, tendinitis of the right shoulder, carpal tunnel syndrome, anxiety and depression, and seizure disorder. Dr. Balk noted that Plaintiff's chronic pain syndrome was, at times, diagnosed as fibromyalgia, "not specified," or arthritis. As to Plaintiff's right shoulder tendinitis, Dr. Balk noted that diagnosis was incomplete because "several observers have noted that there was a limitation of motion in the left shoulder, not the symptomatic one," (emphasis added) which "raise[d] [the] possibility that this is a frozen shoulder, a very specific type of tendinitis." Dr. Balk noted that the postoperative EMG had not been provided to him relative to Plaintiff's carpal tunnel syndrome (R. 1213, 1222). Dr. Balk mentioned, "for the record" that Plaintiff also had diagnoses of narcotic abuse,

alcohol and benzodiazepine abuse, GERD, kidney stones, trembling sensation, and a mild to moderate cognitive deficit (R. 1214).

The ALJ asked Dr. Balk the following hypothetical question:

I am limiting the person to sedentary work with performance of postural movement occasionally, meaning, up to one-third of a workday, but no climbing or ladders, ropes or scaffolds. There is no overhead lifting or reaching with the dominant right upper extremity. All walking should be done on level and even surfaces. The claimant should not be exposed to any kind of environmental pollutants including, but not limited to, smoke, dust, fumes, chemicals, etc. And should not be exposed to any hazards. This person should work in a low-stress environment, with no production or assembly-line-type of pace and no independent decision-making responsibilities. The person should work – is limited to unskilled work involving only routine and repetitive instructions and tasks. Should have no interaction with the general public and no more than occasional interaction with others. The work should accommodate the use of a portable oxygen supply as might be necessary during or throughout the workday. Now, with that RFC, the Vocational Expert at the previous hearing identified jobs that such a person could perform. No[w], based on your review of the medical records and the impairments, do you think that the claimant could do that limited range of sedentary work? (R. 1215).

Dr. Balk responded, "Yes, I do, Your Honor" (R. 1215).

The ALJ then stated to and asked Dr. Balk the following:

Then let me ask you to – I'd like to broach this subject of over-medication (sic). To my way of thinking, Dr. Jilogg's [PHONETIC] statement was, I think too – it was overly broad. He simply said that nobody who takes these – all of thee medications could work, and I don't see what the basis for that generalization is. I proceeded on the premise that every one reacts differently to medications, and that I don't see how that Dr. Jilogg could say that nobody, including the claimant – what he is saying is, I guess, the entire range of humanity could not work if they took these medications, and what are your thoughts on that, Doctor? (R. 1215-216).

Dr. Balk responded as follows:

Well, Your Honor, [INAUDIBLE] there were really appropriate for a very specific status. I think if one added the words at the beginning, in a [INAUDIBLE] individual, a person who's never used to these drugs and would take them, the vast, vast majority of people who take combinations of Benzodiazepine, alcohol, a variety of morphine derivatives acutely, all at once, never having been exposed to it, certainly, would have difficulty, if not, the inability to function in the routine

activities of daily living. But it's well known in medicine and well know (sic) in the public that with continued use of these medication (sic), a process called tolerance develops. And individuals who take these medicines, as time goes on, they get less and less of the effects, which were noted initially. And the only way they can overcome it is by taking more of that medication to achieve the same end results. And this is called tolerance (R. 1216).

And, for example, with morphine derivatives. This is why addiction occurs, because they can't get away from the medicine. They have to take more and more over a period of time. And morphine, for example, the functioning, the [PHONETIC], the vital signs, these all become altered as one keeps taking them. Everything except constipation. You know, [INAUDIBLE] of (sic) constipation continues to occur in a heavy does, but I think his point was, well take [INAUDIBLE] surgery, I couldn't function. And I daresay that would be true for most people, but as they keep taking them and perhaps we have numbers of people who would take, for example, three Percocet a day for significant arthritis, and they were able to function in jobs, and if there (sic) employer didn't know they were on the medicine, there was no easy way for them to find out short of a (sic) urine or blood study. So, specifically, his statement was true for a very limited period of time in a given individual's tolerance. But it's not a broad statement. Many people can take these drugs and they do for years and years without any [outward] manifestation that would be obvious to other people (R. 1216-217).

The ALJ asked Dr. Balk if such a person would be able to work; Dr. Balk responded, "Sure" (R. 1217).

Plaintiff's counsel asked Dr. Balk if "no people would have continued effects from the soporific effects [of the drugs]." Dr. Balk replied as follows;

Oh, I can't say that. I certainly don't want to imply anything like that. You know, we don't have good research into combination of drugs. For example, the four psychotropic drugs that you mentioned. . . (R. 1225). What happens when people take all of these medicines – actually, Remeron and then the combination with Benzodiazepine, we have no research to know what happens with those groups, when drugs are taken of various varieties . . . . And we just don't have the research in all these, and most people take these type of drugs, these [INAUDIBLE], they'll have some effects. They'll vary from people to people. That's a large amount of medication (R. 1225-226). My comments were really related to where we have definite research and physiologic studies, and that relates to morphine and benzodiazepine derivatives. Both of which, you know, are unfortunately commonplace in the population (R. 1226).

Plaintiff's counsel stated and asked the ALJ the following: "I guess I'm troubled by the whole – the acceptance of the RFC as given by the Judge that at least from my standpoint did not include all of the limitations that the person might reasonably have. Are you saying in your acceptance of that, that there would be no other limitations than given in that hypothetical?" (R. 1226).

Dr. Balk responded as follows:

Well, you know, I have not examined this gentleman, and I only received a report of Dr. Hout relating to the neuropsychiatric, neuropsychological limitations, and I certainly wouldn't want to comment in that field, although, the evidence, you know, throughout the records is quite impressive as far as the psychological, psychiatric role is here. What I've been able to identify is that there is a problem with the shoulder, and, particularly, the right; possibly both. I'm not sure what's happened to the hand, because one observe (sic), for example, said that the grip of the right hand is reduced. That's coming from the right shoulder, and yet in Dr. Hout's report, which is the most current and, incidentally, it's extremely thorough from a neurological viewpoint, he doesn't find any motor weakness in the hand. I just don't understand much of these – why there's such a disparity, but there's really no detail. There is nothing, you know, for example, when we describe a carpal tunnel, the nerve that supines involves thumb abduction, the ability of the thumb to touch over the fifth or middle finger. That's usually associated with some atrophy that's muscle thinning. You can see it. It's, you know, particularly if you compare it with the other side. There are certain things that have lost. No one has documented any of this information. They simply say, you know, the hand is weak, but it requires much more than that. There are three major nerve, what nerve is it, what's the severity and unfortunately, I'm not given that information. No one has done it. . . . Dr. Hout's report, which is – I think the most thorough and the most detailed, in his second page, he says motor examination revealed intact strength of drift with no pronate or drift, but decreased, rapid alternating movements. Simple repetitive [INAUDIBLE] were intact. You know, here's that information and then another observer some years ago said the hand – the grip was weak. So, I think you can understand the frustrations I have in trying to give you the information that, you know, you want (R. 1226-228).

(Emphasis added). Dr. Balk testified that the difference between myofascial pain syndrome and fibromyalgia was that myofascial pain syndrome was localized pain and fibromyalgia was diffuse or generalized pain (R. 1218).

The ALJ noted Plaintiff had had a "recent relapse . . . into alcohol" (R. 1232). Plaintiff's counsel stated she was going to "clarify with Dr. Hout whether he did or did not include alcohol in the assessment" of Plaintiff (R. 1235). The ALJ stated he would "wait for the response" (R. 1237).

Plaintiff's counsel asked the VE to consider the hypothetical question the ALJ asked Dr. Balk and added the following:

> Okay. Assuming that we had that RFC, and we have an individual who, because of a combination of his problems, which not only include pain medication effects, but mental functioning and also using oxygen, but this person would from one-third to one-half the time – in other words, fairly often, be unable to maintain regular attendance and punctuality and would also be requesting breaks that were outside the usual breaks provided. They would always be outside the breaks provided, which I understand to mean ten to fifteen minutes morning and afternoon and 30 minutes to an hour at lunch, (sic) would normal competitive employment, in your opinion, allow that type of variation in a normal schedule? (R. 1235).

The VE responded it would not (R. 1235).

### III.  ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (1997), ALJ Alexander made the following findings:

1.    The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 416.920(b)).

2.    During the period at issue, the claimant has had the following severe impairments: history of right rotator cuff tendonitis; history of bilateral carpal tunnel syndrome; chronic pain syndrome, with additional diagnoses of fibromyalgia and arthritis; chronic obstructive pulmonary disease, with concurrent tobacco abuse and history of marijuana abuse; remote history of seizures; depressive disorder; anxiety-related disorder; and history of polysubstance abuse (20 CFR 416.920(c)).

3.    During the period at issue, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926) (R. 58).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of sedentary work; can perform all postural movements occasionally, except cannot climb ladders, ropes, or scaffolds; can perform no overhead reaching or lifting with the right, dominant upper extremity; must perform all walking on level, even surfaces; cannot be exposed to environmental pollutants, such as smoke, dust, fumes, gases, or chemicals, or to hazards; should work in a low stress environment with no production line type or pace or independent decision making responsibilities; is limited to unskilled work involving only routine, repetitive instructions and tasks; should have no interaction with the general public and no more than occasional interaction with coworkers and supervisors; and is limited to jobs that accommodate use of a portable oxygen supply as might be necessary during or throughout the workday (R. 63).

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on September 16, 1969 and was 34 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not material to the determination of disability due to the claimant's age (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity present since January 27, 2004, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966) (R. 72).

10.     The claimant has not been under a "disability," as defined in the Social Security Act, at any time since January 27, 2004 (20 CFR 416.920(g)) (R. 73).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law."  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B.  Contentions of the Parties

Plaintiff contends:

1.      There is lack of evidentiary support for the ALJ's finding that the claimant's use of medications were not necessary to his treatment and that continued use of the medications would result in a tolerance to them and they would have no significant effect on the claimant's ability to perform the work described in the RFC in the decision, when the ALJ's conclusions are based upon errors of fact, medical judgments beyond his expertise, mischaracterization/misstatements regarding the testimony of Dr. Balk, and a factually incorrect statement that claimant was discharged from a clinic for failing a drug screen (Plaintiff's brief at pp. 9-10).

2.      There is lack of support for the ALJ's mental RFC when he rejected the neuropsychological report of Dr. Haut for insufficient reasons when the Appeals Council wanted a psychological evaluation, when Dr. Balk testified that it was the most thorough and detailed, and when by the regulatory factors should be been entitled to the most weight.  This was prejudicial because had the report been given appropriate weight, plaintiff would have been found disabled (Plaintiff's brief at p. 13).

3.      The two decisions by ALJ Alexander are fraught with errors of fact, misstatements, speculations not founded in fact, gratuitous disparaging remarks about the claimant which were contrary to the opinions of his own physicians, and appear to reflect a bias against "SSI only" claimants who do

not have impressive work histories, claimants who are prescribed narcotic and other addictive medications, claimants who file multiple disability claims, claimants who have a history of drug and/or alcohol abuse, claimants with mental impairments, and particularly, claimants who repeatedly contest SSA decisions, especially his own (Plaintiff's brief at p. 15).

The Commissioner contends:

1.      Substantial evidence supports the ALJ's finding that Plaintiff could perform the limited range of sedentary work identified by the vocational expert (Defendant's brief at p. 10).

### C. Medication Use and Side Effects

Plaintiff first argues: "[T]here is lack of evidentiary support for the ALJ's finding that the claimant's use of medications was not necessary to his treatment, and that continued use of the medications would result in a tolerance to them and they would have no significant effect on the claimant's ability to perform the work described in the RFC in the decision. Plaintiff argues that the ALJ's conclusions are based upon errors of fact, medical judgments beyond his expertise, mischaracterization/misstatements regarding the testimony of Dr. Balk, and a factually incorrect statement that claimant was discharged from a clinic for failing a drug screen" (Plaintiff's brief at pp. 9-10).

With respect to the impact of Plaintiff's medications on his RFC, the ALJ rendered the following analysis and findings which Plaintiff now challenges:

As directed by the Appeals Council, in assessing the claimant's residual functional capacity the undersigned has considered the opinion of Dr. Chillag, the medical expert at the hearing held on January 18, 2008, that the claimant was over-medicated to such an extent that work activity was not possible. (Exhibit B-8A). As detailed in the prior hearing decision, the undersigned finds that the claimant's use of addictive medications is part of his long history of drug seeking behavior and not necessary to his treatment or survival. As detailed above, the claimant did not seek further mental health treatment when he was once again able to obtain his medications from Dr. Boyce after being discharged from the treating clinic for failing a drug screen. Further as detailed by Dr. Balk at the hearing held on September 10,

2009, the continued use of the medications used by the claimant would result in a tolerance to them and they would have not significant impact on the claimant. He testified that as a rule the tolerance is an almost universal development and that in the absence of random testing there would be no way of determining that an individual was taking the medications. The undersigned agrees with Dr. Balk and finds that the claimant's records fail to document the degree of over medication opined by Dr. Chillag. The overall record fails to establish that the claimant's combination of impairments or any medication side effects preclude his performance of the above - detailed range of sedentary work on a regular and continuing basis, eight hours a day for five days per week (Social Security Ruling 96-8p). The undersigned further notes that he presented the residual functional capacity as set forth above to Dr. Balk and asked him whether he felt that the claimant could perform work within those parameters and limitations, to which Dr. Balk responded in the affirmative. R. 72.

The ALJ earlier found:

Subsequent reports from the claimant's treating clinic establish that the claimant had a urine drug screen on June 2, 2006, that was positive for THC and opiates. Following the receipt of the results of the urine drug screen, on July 25, 2006, Dr. Stewart at Braxton Community Health Center advised the claimant that he needed to schedule alternative care of his impairments (Exhibit AC-2) The timing of the claimant's discharge from treatment at this clinic coincides with his report to the mental health center on August 29, 2006, that he was upset because his primary physician and provider of his pain medication got fired and the claimant could not get another physician in town to write his pain medications (Exhibit AC-5). Once again, the claimant's history reported to any evaluating mental health professional is not accurate, as it was the results of the drug screen that led to his discharge from treatment at the clinic and not the firing of the doctor. [emphasis added] R. 61.

Plaintiff complains the ALJ erred by: 1) finding that the claimant's use of medications were not necessary to his treatment; 2) finding that claimant's continued use of the medications would result in tolerance to them; 3) finding that the medications used would have no significant effect on claimant's ability to perform the work described in the RFC ; 4) making medical judgments beyond his expertise; 5) mischaracterizing the testimony of Dr. Balk; and 6) making a factually incorrect statement that claimant was discharged from a clinic for failing a drug screen.

Of the 6 issues raised by Plaintiff, 1 and 4 fall under the category of application of the proper standards of law and 1, 2, 3, 5, and 6 fall under the category of substantial factual evidence.

There can be no dispute the ALJ did find: "As detailed in the prior hearing decision, the undersigned finds that the claimant's use of addictive medications is part of his long history of drug seeking behavior and not necessary to his treatment or survival." The finding that Plaintiff's use of addictive medications "is part of his long history of drug seeking behavior" is supported by evidence in the record. There is more than substantial evidence that Plaintiff refused pain management or psychological counseling offered, even when he was unable to obtain his medications from Dr. Boyce, as found by a number of Plaintiff's providers, including:

- May 3, 2003--a barrier to Plaintiff's treatment for "somatic concerns" was that he received doctor's care only. The barrier to Plaintiff's efforts to increase his concentration was that he was unwilling to accept suggestions. The barrier to Plaintiff's improvising socialization was that he was not motivated. The barrier to Plaintiff's reducing hostility and self neglect was noncompliance with treatment (R. 232);

- February 26, 2004 – "The treatment team recommended psychotherapy, but [Plaintiff] refused this modality" (R. 525);

- April 5, 2004– Plaintiff had not received inpatient mental health care. It had been recommended by several individuals that he undergo counseling, but he would "not take it." (R. 444);

- June 7, 2005 - - Plaintiff had shown no improvement in symptoms. Plaintiff was unwilling to receive therapy. Plaintiff would see Dr. Scharf once more to get medication refilled and

then he would be discharged. Plaintiff refused to participate in therapy and was discharged to his primary care physician (R. 615);

- August 29, 2006– Ms. Cook of United Summit Center suggested a pain management clinic but Plaintiff declined, stating "he would not want to travel out of town and he knew the only thing that would help him [was] the medication." (R. 1080);

- November 14, 2006– Plaintiff "agreed to continue pharmacological management but [was] still unwilling to attend therapy," telling his provider that "his medical problems were far too intense for him to attempt to concentrate on anything." The provider concluded Plaintiff "was unreceptive to CM's suggestion of how therapy may help to take his mind off of the pain or think more clearly" (R. 1086);

- November 5, 2008 - - Plaintiff sated he had PTSD due to his girlfriend's murder, but "refused to seek psychiatric treatment" (R. 924).

Plaintiff's counsel argues Plaintiff did not want counseling because he was "generally uncomfortable with people and avoiding interaction[.]" The undersigned finds no support for this claim in the record. The undersigned questions how Plaintiff would know therapy or a pain clinic would not work, where he had refused every offer or direction to obtain any treatment other than medication. Further, this is not among the many reasons (some listed above) that Plaintiff actually expressed to his providers for refusing offered or directed treatment other than drugs.

The undersigned cannot, however, state with certainty that the conclusion of the ALJ that Plaintiff's use of addictive medications was "not necessary to his treatment or survival" is supported by the record. Plaintiff's treating physicians prescribed him a myriad of drugs, many of which were narcotics and addictive. It is undisputed that for a period of time in late 2006 to early 2007 Plaintiff

had difficulty obtaining his drugs. The ALJ found the difficulty was because Plaintiff tested positive for a controlled substance [THC]. Plaintiff correctly responds that the initial positive drug screen was refuted by a test performed by a subsidiary of Mayo Clinic (R. 1043, 1041-1042). The more probable reason for Plaintiff's leaving the Braxton Community Health Center was that his doctor quit or was fired, and his replacement, Dr. Stewart, refused to keep prescribing the medications Dr. Boyce had been prescribing. After reviewing Plaintiff's medication chart, Dr. Stewart discussed with him "addictive/tolerance issues " and provided "an interim prescription," but instructed Plaintiff to seek alternative care (R. 1044.) Plaintiff told Ms. Cook of United Summit Center on August 29, 2006 that he was "upset because his primary physician and provider of his pain medication got fired and [he] could not get another physician in town to write his pain medications." (R. 1080.) During the period Plaintiff was unable to get his drugs from Dr. Boyce, the physicians and nurse practitioner at United Summit Center provided Plaintiff with potentially addictive prescription pain medication [Lorcet]. (R. 1084.) By mid-May 2007, the record reflects that Plaintiff was seeing his prior treating physician, Dr. Boyce, at the Richwood Clinic and receiving prescription medicines including pain killers (R. 1089). When Plaintiff transferred his care to Dr. Given, the doctor continued to prescribe the medications for Plaintiff (R. 1096, 1103, 1108).

The only evidence the undersigned was able to find in the voluminous record that was suggestive that Plaintiff was over-medicated and the prescribed medications were not necessary, was the testimony of Dr. Chillag during the second ALJ Hearing held January 16, 2008. Dr. Chillag testified: "He's definitely over medicated, and the doctors are treating him with medications, which cause him to be drowsy and far from being alert. So, while he's taking all these medications, he could take it – he couldn't do any kind of work, but the question is whether all these medications are

necessary or not. This gentleman's condition should be evaluated by a psychiatrist or a psychologist. I don't have anything to – that would allow me to disable him from any – at least light to medium work." R. 1180. Later in the doctor's testimony he spontaneously states: "And it's, as recently as November of '07, he was markedly over medicated, and nobody can function in any kind of work taking all that junk" (R. 1181). Dr. Chillag opined Plaintiff's stomach pain was more psychogenic than physical (R. 1182). When questioned about Plaintiff's moderately impaired concentration and memory ranges Dr. Chillag opined "[t]hat could be from all the medication he's taking" (R. 1182). When the ALJ attempted to suggest that he could not "accept the conclusion that the claimant is incapable of any kind of work just because of these various medication," Dr. Chillag testified: "Well, anyone who is taking Xanax three times a day and steroids and Dilantin and Remeron on a regular basis could not concentrate on any – even light tasks. Whether they're necessary or not is not for me to say" (R. 1183). When counsel asked Dr. Chillag about Plaintiff's use of oxygen, inhalers and breathing pills, the doctor testified that, in his experience the use of the oxygen and medications were not typical and "I don't know how much of this medication is necessary to be with – and I don't know, according to his pulmonary function test, he shouldn't need oxygen. But he smokes so much that - - that might interfere somewhat with his breathing capacity" (R. 1187). Such a finding begs the question: If the drugs were not necessary, would physicians prescribe them for Plaintiff as shown by the longitudinal record? In summary, Dr. Chillag opined Plaintiff was over medicated from a physical standpoint; could not say whether the medications prescribed were necessary to Plaintiff's treatments; that Plaintiff could not do light work tasks given the medications he was taking; and that Plaintiff should be evaluated by a psychologist or psychiatrist. Given that Dr. Chillag's testimony was given in 2008 based on 2007 and earlier records, that the case was remanded by the Appeals

Council for psychiatric and/or psychological evaluations and a determination of what if any role medications played in the disability picture, the undersigned does not find Dr. Chillag's opinions determinative of the issue raised in this portion of Plaintiffs complaint.

It cannot be disputed that Dr. Stewart and Ms. Cook each discussed with Plaintiff the addictive nature of some of his medications and the building of tolerance to them over time (R. 1044). Ms. Cook noted that Plaintiff was "correct that the other physicians in the surrounding area [were] refusing to treat patients for chronic pain, but they [were] willing to treat them/him for anything else." She noted that she explained to Plaintiff that "most physicians prefer not to treat chronic pain with medication because patients become addicted or tolerant to the medication at some point." In 2006, N. P. Peasak. Plaintiff's treating provider, actually diagnosed Plaintiff with opiate tolerance and benzodiazepine tolerance.

Counsel argues that Dr. Balk "admitted" that "most people take these types of drugs, these [INAUDIBLE] (combined), they'll have some effects. They'll vary from people to people. That's a large amount of medication." (Plaintiff's Brief at 11). Counsel takes this one statement out of context, however. The substance of Dr. Balk's expert testimony on the subject is capsulized in the following statement: "Many people take these drugs and they do for years and years without any [outward] manifestation that would be obvious to other people." When asked if such a person would have the ability to work, Dr. Balk responded: "Sure." (R. 1217). On cross-examination by Plaintiff's counsel, Dr. Balk acknowledged all people were not the same but "as a rule tolerance is almost a universal [inaudible]" (R. 1224). When Plaintiff's counsel asked if in his acceptance of the RFC propounded by the ALJ (R.1215) the doctor would not add any other limitations, the substance of his response was that he had not examined Plaintiff; had received Dr. Hout's report relating to

neuropsychiatric, neuropsychological limitations and would not comment on those fields, and so had insufficient information to modify his position with respect to limitations to Plaintiff's hands or shoulders (R. 1226-1231). Despite this response, Dr. Balk's conclusion was that, based on the medical records and impairments that he had reviewed, it was his opinion that Plaintiff could perform sedentary work as limited by the ALJ's RFC ( R. 1215).

Counsel also argues that the ALJ's comment at the hearing that Plaintiff had never complained about side effects was in error. Counsel then cites four pages from the voluminous record to support a contention that Plaintiff had complained about side effects. All four were on forms submitted to Social Security. None were concerns voiced to health care providers. The sole reference to a side effect reported to a physician the undersigned could find was a reaction to Cymbalta, which was then discontinued with a different medication substituted. Other than that, Plaintiff reported no side effects to any treatment provider. On January 6, 2004, Plaintiff had no adverse side effects from Xanax and Remeron (R. 520). On July 29, 2004,Plaintiff had no side effects from Lexapro (R. 517). In August, 2004, Plaintiff was doing better with sleep and was stable on Lexapro (R. 521). In June 2005, Duragesic and Lorcet eased his pain but did not take it away, but his depression was "worse today because he was denied Social Security." He later said, he "had started feeling somewhat better, which he attributed to his medications, until he received his sixth denial letter for social security benefits three weeks ago." (R. 1079). In October 2006, Plaintiff said he had "done well on his meds, up until recently, when his physician quit practicing at the hospital . . . ." (Emphasis added).

This Court has addressed this identical issue previously, in Cogar v. Commissioner, 2010 WL 300373. The Plaintiff in that case alleged that his medications caused dizziness and "knocked him

out a lot." The Court stated: "Review of the record does not indicate that Plaintiff ever complained of these side effects to any of his doctors, however. He did not ask any doctor whether a change in the medications, dosages, or timing of the dosages may have alleviated these symptoms. Further, the DDS reviewing physicians knew of Plaintiff's taking of hydrocodone and Flexeril, yet found him capable of performing medium work . . . . The documents cited by plaintiff in support of his allegations regarding his medications are solely from his own statements on disability application forms or his testimony . . . . Not one is from a medical report . . . .None are doctor's reports or even Plaintiff's own reports to doctors."

In Burns v. Barnhart, 312 F.3d 113 (3rd Cir. 2002), the court considered the issue of side effects of medications. The court stated that the ALJ noted the record contained no significant complaints of side effects from medication. The Court also noted that there was no medical evidence as to any physical limitations resulting from any side effects from medication. The Court then held:

> Drowsiness often accompanies the taking of medication, and it should not be viewed as disability unless the record references serious functional limitations. Here, there is not such evidence.

This sentence was quoted with approval in Johnson v. Barnhart, 434 F.3d 650 (4th Cir. 2005). See also Turner v. Commissioner, 192 Fed. Appx. 946 (11th Cir. 2006)("[T]he ALJ did not err in discrediting Turner's testimony regarding side-effects from her medications because the record includes no evidence that Turner consistently complained to her doctors of any side-effects").

For clarity purposes, the undersigned finds: 1) that the ALJ's finding that the claimant's use of medications was not necessary to his treatment is not supported by substantial evidence of record and violates the rule against an ALJ substituting his lay opinion for the medical opinions; 2) that claimant's continued use of the medications would result in a tolerance to them is substantially

73

supported by the record and by the testimony of Dr. Balk and does not constitute the ALJ substituting his lay opinion for medical opinions; 3) that the medications used would have no significant effect on claimant's ability to perform the work described in the RFC is supported by substantial evidence in the record including the testimony of Dr. Balk and does not constitute the ALJ substituting his lay opinion for medical opinions; 4) that the ALJ did make a medical judgment beyond his expertise with respect to his finding that the claimant's use of medications were not necessary to his treatment as hereinbefore noted; 5) that the ALJ did not mischaracterize the testimony of Dr. Balk; and 6) the ALJ did make a factually unsupported conclusion that the claimant was discharged from a clinic for failing a drug test.[3]

With respect to findings 1,4 and 6 the undersigned further finds and concludes that they are not reversible error, in that they are not relevant to the conclusion reached by the ALJ which is at the heart of this controversy, to wit: "The overall record fail[s] to establish that the claimant's combination of impairments or any medication side effects preclude his performance of the above -detailed range of sedentary work on a regular and continuing basis, eight hours a day for five days per week (Social Security Ruling 96-8p)." In other words, even if every one of the medications was necessary, they did not, alone or in combination, prevent Plaintiff from performing work available in the national economy.

_____

[3] Even if the ALJ was incorrect that Plaintiff was discharged from Braxton due to a positive THC test, it is undisputable that he did, in fact test positive for THC there, at that time. True, the confirmation test by another facility was negative for THC, but oddly both tests were also negative for benzodiazepines which were prescribed for Plaintiff, and presumably used daily, as prescribed, for his mental impairments. Further, Plaintiff did test positive for THC in 2008, and admitted to using marijuana on a fairly regular basis.

Further, counsel made specific reference in her questions to the medical expert regarding Plaintiff's need for oxygen use during the day. That use of oxygen, however, was not prescribed and therefore was not necessary to Plaintiff's treatment. It was meant for night-time use, when his oxygen levels apparently lowered. There is no evidence it helped him as he used it or certainly that it was a medical necessity.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's conclusion that Plaintiff was capable of work existing in the national economy, despite his impairments and the medications taken to treat them.

### D. Dr. Haut's Report

Plaintiff next argues "[t]here is lack of support for the ALJ's mental RFC when he rejected the neuropsychological report of Dr. Haut for insufficient reasons when the Appeals Council wanted a psychological evaluation, when Dr. Balk testified that it was the most thorough and detailed, and when by the regulatory factors should be been entitled to the most weight. This was prejudicial because had the report been given appropriate weight, plaintiff would have been found disabled.

20 C.F.R. § 404.1527 states:

> (c) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
> > (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical

professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The

better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

It is undisputable that Dr. Haut is not a treating physician. He is an examining physician, however, with a specialization in neuropsychology. These two factors support his opinion being entitled to greater weight, but not necessarily "the most weight," as posited by Plaintiff. It is important to note that the record for this current claim begins in 2002, whereas Dr. Haut never saw Plaintiff until 2009. During those interceding 7 years, Plaintiff did have treating and examining physicians and mental health providers, whose opinions might also be entitled to great, or even greater weight than Dr. Haut's.

A psychological evaluation in February 2002, indicated Plaintiff had no signs of organic brain dysfunction. He was diagnosed with mood disorder as a result of pain (R. 535, 761). In April 2002,

psychologist Posey found Plaintiff had no organic brain dysfunction and his comprehension was normal. She diagnosed major depressive disorder without psychotic features, moderate; alcohol abuse; cannabis related disorder, and schizoid disorder (the last based on Plaintiff's own report of few social relationships and solitary activities, among others.) In December 2002, psychiatrist Buda diagnosed Plaintiff with depressive disorder (R. 442). In January 2004, psychiatrist Scharf treated Plaintiff for depression "during the holidays." Dr. Scharf opined that much of Plaintiff's depression was due to his inability to work (R. 520). In February 2004, United Summit Center providers found Plaintiff's memory, concentration, persistence, and pace were all normal. He had been diagnosed with major depressive disorder, single episode, moderate, with a recommendation of psychotherapy, which Plaintiff refused (R. 524). In April 2004, Psychologist Klein examined Plaintiff and diagnosed social phobia and chronic adjustment disorder with depressed mood (R. 446). That same month, Dr. Sharf observed that Plaintiff suffered from Major Depression in a partial state of remission. He was nervous to a degree, but his depression seemed to be under fairly good control, considering he was financially destitute and in pain (R. 519). In July 2004, Dr. Sharf noted Plaintiff's depression was a bit better, but he still had significant depressed mood and affect (R. 517). In March 2005, Ms. Szabo noted Plaintiff had symptoms of depression. In August 2005, Plaintiff told Dr. Boyce his depression was "worse today [because he was ] denied for Social Security (R. 1058). In September 2005, United Summit Center providers noted Plaintiff had only moderate anxiety and depression. He said he had started feeling somewhat better, which he attributed to his medications, until he received his sixth denial for social security benefits.

In August 2006, United Summit Center again performed a psychiatric evaluation of Plaintiff. He said he had experienced moderate depression and anxiety for ten years. He was especially upset

78

because his prescribing physician had been fired and he could not get another physician to write his pain medications. He was diagnosed with major depressive disorder (R. 1082). In October 2006, N.P. Peasak diagnosed Plaintiff with depression and anxiety secondary to medical condition of chronic pain or chronic medical condition; rule out recurrent depression; pain disorder; opiate tolerance; benzodiazepine tolerance; nicotine dependence; history of alcohol and marijuana dependence; and rule out personality disorder. (R. 1085). Plaintiff had intact and unimpaired memory, and average intellect. In November 2006, Plaintiff had moderate depression and anxiety, "both of which have remained stable over last 90-day period" (R. 1086). Dr. Kline found Plaintiff had persistent depression possibly just secondary to chronic pain (R. 1071). Throughout 2007, Nurse Peasak found Plaintiff had depression and anxiety, "secondary to pain" (R. 1075).

Plaintiff switched to Richwood in May 2007. Mentally, he was diagnosed with depression and anxiety (R. 1089). He was later diagnosed with insomnia. In November 2007, Richwood added a diagnosis of generalized anxiety disorder (R. 853).

On September 10, 2008, nine months after the hearing, and days before the ALJ's decision, Plaintiff presented back to Braxton Health Associates and was diagnosed with bipolar disorder "due to the brutal murder of his girlfriend" (R. 925). He was positive for THC on this date. Three weeks later he presented with complaints of depression and PTSD "as a result of his girlfriend's murder." In November, 2008, he reported chronic depression secondary to the "brutal stabbing/murder of his girlfriend and girlfriend's mother." Dr. Given diagnosed bipolar disorder, depressed, in partial or unspecified remission; unspecified anxiety state; and depressive disorder, not elsewhere classified." He reported that Plaintiff "had been in and out of therapy since girlfriend's murder and [did] not

want to see anyone." There is no support for this statement in the record. Later that month, Dr. Given diagnosed bipolar and anxiety (R. 933).

In July 2009, Plaintiff was diagnosed by his treating physician with depression and anxiety (R. 932). Blood work showed he had been drinking and not taking his medications. Dr. Given later diagnosed Plaintiff with depression and PTSD.

Dr. Haut's examination took place one month later. Plaintiff reported he "experienced continuing severe symptoms of depression." He also reported PTSD and anxiety, said he had difficulty with concentration and short-term memory, and could not even "follow" movies. He said his girlfriend had been murdered. Dr. Haut found Plaintiff was experiencing mild to moderate cognitive deficits, due to COPD, chronic pain, and ongoing depression and anxiety. He found he met listings 12.04, 12.06, and 12.02. He found Plaintiff had repeated episodes of deterioration in a work-like setting, based on his clinical interview with Plaintiff. Dr. Haut completed a PRT, finding Plaintiff had organic mental disorders and affective disorders. He did not document any factors to support the finding of organic mental disorder. His affective disorder was major depressive disorder, and his anxiety disorder included PTSD symptoms from a traumatic experience. He again found Plaintiff had experienced three episodes of decompensation in a work or work-like setting.

Dr. Given filled out a Fibromyalgia Residual Functional Questionnaire in September 2009. He stated Plaintiff's severe depression and PTSD contributed to the severity of his symptoms and functional limitations.

On September 2009, Dr. Haut reiterated that Plaintiff's consumption of alcohol did not account for the majority of his symptoms and limitations, even though it would influence some of his cognitive functioning and worsen his depression and anxiety. He reiterated that Plaintiff's major

limitations had to do with attention, concentration, and pace, and a markedly limited ability to tolerate work stress, neither of which would improved if he stopped drinking.

Throughout 2009, treating physician Givens found Plaintiff depressed and anxious and a little better with Cymbalta. Plaintiff continued to report depression due to the brutal stabbing murder of his girlfriend throughout 2010.

First, and most significantly, the ALJ did not "reject" Dr. Haut's report, as counsel asserts. After a thorough analysis of Dr. Haut's report in light of the longitudinal medical history that preceded it, notations of inconsistencies between Dr. Haut's findings and conclusions and prior treating physician and evaluating physician reports, notation of the inconsistency of the reported stressor of loss of his girlfriend (once reported as his spouse) in an automobile accident versus her murder and the murder of her mother, the ALJ concluded:

> Based on the questionable basis for the reported diagnosis of organic mental disorder, the undersigned rejects this diagnosis reported by Dr. Haut. The diagnosis of an affective disorder is accepted but his diagnosis of a posttraumatic disorder is also rejected as it is also not supported by the longitudinal record.

(R. 61).

Second, counsel misinterprets Dr. Balk's testimony that Dr. Haut's report was the most through and detailed in the record. Dr. Balk himself expressly testified that Plaintiff's severe mental impairments were depression and an anxiety disorder. He expressly did not include an organic mental disorder. His remarks quoted by counsel concerning Dr. Haut's report were in the context of Plaintiff's hand and arm impairments, as follows:

> What I've been able to identify is that there is a problem with the shoulder, and, particularly, the right; possibly both. I'm not sure what's happened to the hand, because <u>one observe (sic), for example, said that the grip of the right hand is reduced.</u> <u>That's coming from the right shoulder, and yet in Dr. Hout's report, which is the</u> <u>most current and, incidentally, it's extremely thorough from a neurological</u>

viewpoint, he doesn't find any motor weakness in the hand. I just don't understand much of these – why there's such a disparity, but there's really no detail. There is nothing, you know, for example, when we describe a carpal tunnel, the nerve that supines involves thumb abduction, the ability of the thumb to touch over the fifth or middle finger. That's usually associated with some atrophy that's muscle thinning. You can see it. It's, you know, particularly if you compare it with the other side. There are certain things that have lost. No one has documented any of this information. They simply say, you know, the hand is weak, but it requires much more than that. There are three major nerves, what nerve is it, what's the severity and unfortunately, I'm not given that information. No one has done it. . . . Dr. Hout's report, which is – I think the most thorough and the most detailed, in his second page, he says motor examination revealed intact strength of drift with no pronator drift . . . .

(Emphasis added). Dr. Haut is an evaluating neuropsychologist. He is not a treating physician. More importantly, his findings and diagnoses are inconsistent with more than ten years of treating providers' findings. No other provider found an organic mental disorder. In fact, several expressly found he did not have such a disorder. Most found he had depression and anxiety, two impairments the ALJ included as severe in his decision. Most also did not find marked memory, attention, and concentration limitations found by Dr. Haut. There is also no support in the record or even in the report for Dr. Haut's finding that Plaintiff had had three episodes of decompensation, each of extended duration.

The undersigned therefore finds the ALJ's evaluation of Dr. Haut's report is supported by substantial evidence.

## E. Other

Plaintiff finally argues "[t]he two decisions by ALJ Alexander are fraught with errors of fact, misstatements, speculations not founded in fact, gratuitous disparaging remarks about the claimant which were contrary to the opinions of his own physicians, and appear to reflect a bias against 'SSI only' claimants who do not have impressive work histories, claimants who are prescribed narcotic

and other addictive medications, claimants who file multiple disability claims, claimants who have a history of drug and/or alcohol abuse, claimants with mental impairments, and particularly, claimants who repeatedly contest SSA decisions, especially his own."

The undersigned first notes that Plaintiff has not complied with Local Rule of General Procedure 83.12(f), which provides that "[c]laims or contentions by the plaintiff alleging deficiencies in the Administrative Law Judge's consideration of claims or alleging mistaken conclusions of fact of law and contentions or arguments by the Commissioner, supporting the ALJ's conclusions of fact or law must include a specific reference, by page number, to the portion of the record which (1) recites the ALJ's consideration or conclusion and (2) which support the party's claims, contentions or arguments." The sole support for Plaintiff's argument is one sentence: "The two decisions by Judge Alexander are the best evidence of this as he portrayed Glenn as an undeserving deadbeat out to cheat the system, without any basis in the record for so doing." (Plaintiff's brief at 15). The undersigned therefore finds Plaintiff's bare-bones contention is unsupported. The undersigned further does not find the ALJ portrayed Plaintiff as "an undeserving deadbeat out to cheat the system."

The ALJ's decision was based largely on his credibility finding. The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in <u>Craig v. Chater</u>, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A)

requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594.

The ALJ found that Plaintiff's testimony and statements concerning the intensity, persistence, and limiting effects of his impairment-related symptoms were "significantly exaggerated and clearly lacking in reliability" (R. 64). The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)). The decision was quite thorough in citing the medical evidence and statements of Plaintiff that affected his credibility, including numerous inconsistencies.

Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *5-*8 (SSA) provides, in pertinent part:

One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record. The adjudicator must consider such factors as:

The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.

The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). The adjudicator must also look at statements the individual made to SSA at each prior step of the administrative review process and in connection with any concurrent claim or, when available, prior claims for disability benefits under titles II and XVI. Likewise, the case record may contain statements the individual made in connection with claims for other types of disability benefits, such as workers' compensation, benefits under programs of the Department of Veterans Affairs, or private insurance benefits. However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

The record for this claim alone begins in 2002.

On February 1, 2002, Plaintiff reported during a psychological evaluation that he sustained severe muscle trauma and eventually developed carpal tunnel syndrome from a 1996 motor vehicle accident which caused him to stop working. He would be unable to work until he received carpal tunnel surgery.

In December 2002, he told another psychiatrist he sustained injuries in a motor vehicle accident in which he girlfriend died.

In April 2004, Plaintiff again said he had to stop working due to injuries he sustained in a 1996 motor vehicle accident. He did not mention a girlfriend and he said he did not stop working due to any mental condition.

In August 2009, Plaintiff reported to Dr. Orvik that he quit working in 1996, due to a "breathing problem," which was also his chief complaint.

In April 2004, Plaintiff told Dr. Klein he hadn't smoked marijuana for six months.

In March 2005, Plaintiff said he had not smoked marijuana for two years.

In September 2008, blood work showed Plaintiff was positive for THC.

In August 2009, Plaintiff told Dr. Orvik he did not use marijuana.

Throughout 2009, Plaintiff told Dr. Given he had last used marijuana in 2000.

In July 2009, a lab report noted that Plaintiff had been drinking and not taking his medications. He was told to stop drinking and to take his medications.

In August 2009, Plaintiff told Dr. Haut he drank once weekly.

That same month he told Dr. Orvik he "occasionally drank in large amounts."

On September 8, 2009, Plaintiff told Dr. Given he had not consumed alcohol since 2007.

In August 2009, Plaintiff told examining physician Dr. Orvik he occasionally used a cane.

That same year treating physician Given stated that Plaintiff did not use, and did not need a cane.

Also in 2002, the first relevant year for this claim, Plaintiff was referred by his own treating physician for an FCE. The physical therapist expressly stated : "Overall test findings, in confirmation with clinical observations, suggest considerable question be drawn as to the reliability/accuracy of Mr. Whitt's subjective reports of pain/limitation." Reliability of Client Reports ("RCR") indicated Plaintiff presented with 4 of 7 inappropriate (anatomically unreasonable) responses, suggestive of inappropriate illness behavior. In addition, subjective

ratings of pain matched poorly with distraction-based clinical observations and repetitive movement reports matched poorly with clinical observations.

In Hayes, 907 F.2d at 1456 (quoting Seacrist v. Weinberger, 538 F.2d 597 (4th Cir. 1976), the Fourth Circuit noted "it is the responsibility of the Secretary and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of nonpersuasion."

Besides considering a plaintiff's statements and testimony regarding his pain and limitations, Craig also requires the ALJ to consider and any medical treatment taken to alleviate them. The undersigned has already found that substantial evidence supports the ALJ's determination regarding the medical treatment Plaintiff took to alleviate his symptoms (medication only) and his refusal to undergo any other treatment besides medication offered, recommended, suggested, or even directed by his providers. In Hunter v. Sullivan, 993 F.2d 31 (4th Cir. 1992) the court found that the plaintiff's discontinuation of physical therapy, failure to sustain a consistent medical regimen for treatment of pain, and the fact that he never required hospitalization for his pain did not comport with his subjective complaints of pain.

Upon consideration of all which, the undersigned finds Plaintiff's final argument is unsupported in the record, and also finds the ALJ's credibility finding is supported by substantial evidence.

Despite already having made this finding, the undersigned United States Magistrate Judge believes it important to note Plaintiff's continuous, apparently almost non-stop smoking, despite his diagnosis of COPD, his use of oxygen and his complaint to at least one recent physician that his "breathing" was his biggest problem and the reason he had to quit work.

The undersigned has long followed the holding in Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984) which states that the Commissioner can only "deny the claimant benefits because of alcohol or tobacco abuse if she finds that a physician has prescribed that the claimant stop smoking or drinking and the claimant is able voluntarily to stop." This Court has, however, adopted a Report and Recommendation submitted by the undersigned that supported the ALJ's consideration, in finding the claimant less than entirely credible, that the claimant continued to smoke although diagnosed with COPD and despite being advised against smoking by his doctors. Sharp v. Commissioner, 2008 WL 269103*18 (N.D.W. Va. 2008). Recently a number of cases, including in this circuit, have held that a claimant claiming disabling breathing problems continuing to smoke when directed by his physician to stop constitutes an acceptable factor in a credibility determination. See, e.g., Massey v. Astrue, 2013 WL 178369 *7 (D.S.C. 2013)("That case [Gordon] does not in any way preclude an ALJ from considering a claimant's failure to stop smoking in the context of a credibility analysis, however.) Spicer v. Colvin, 2013 WL 3929824 *14 (D.S.C. 2013); Gregory v. Commission, 2010 WL 3046991 (D.S.C. 2010)("on numerous occasions, Plaintiff's medical providers instructed her to quit smoking . . . . Plaintiff's failure to stop smoking or even attempt to stop smoking support the ALJ's finding that Plaintiff's allegations about disabling limitations from her [] COPD were not fully credible."); Waters v. Colvin, 2013 WL 2490185 *5 (W.D. Va. 2013); Hambrick v. Astrue, 2009 WL 89423 *8 (S.D.W. Va. 2009)(finding plaintiff's failure to follow directions to stop smoking detracted from her claim of disability); Collison v. Astrue, 2009 WL 3216658 *3 (D. Md. 2009)("[A]n ALJ can consider a Claimant's failure to stop smoking in determining credibility when medical evidence

shows that doctors recommended smoking cessation and that smoking impacted conditions such as COPD").

Courts in other circuits have also held that continued smoking in the face of breathing impairments and instruction to stop can be a factor in assessing credibility. Mouser v. Astrue, 545 F.3d 634 (8th Cir. 2008) (ALJ could consider social security disability claimant's failure to stop smoking in making credibility determination, where claimant complained of shortness of breath, but he continued to smoke pack of cigarettes a day, medical records reflected that smoking likely caused his chronic obstructive pulmonary disease (COPD), and there was no dispute that smoking had direct impact on his pulmonary impairments). McDowell v. Astrue, 2013 WL 3337795 (N.D. Ill. 2013) ("It was not unreasonable for the ALJ to consider [claimant's] smoking habit in making his credibility determination, especially considering [his] COPD is a direct result of his smoking history."); Dillon v. Astrue, 2013 449781 (S.D. Ohio 2013) (The ALJ applied the appropriate standards and his credibility findings enjoy substantial support in the record,, including the mention regarding plaintiff's alcohol abuse and continued smoking in light of his diagnosed COPD); White v. Astrue, 2012 WL 1368159 *9 (N.D.N.Y 2012)(Finding no error in assessing the credibility of the plaintiff in reporting his COPD, where plaintiff continued to smoke cigarettes); Amsbury v. Astrue, 2011 WL 849749 (E.D. Tenn. 2011)(The ALJ still found that she had a severe impairment from COPD and respiratory problems, but the extent of her continued smoking justifiably undermined her credibility to an extent. The ALJ did not use an erroneous standard."); Nelson v. Astrue, 2010 WL 1687914 (S.D. Ind. 2010)("The court concludes that the ALJ was justified in pointing out Plaintiff's smoking habit as a rationale for finding her not credible for two reasons: It shed light on her

financial situation, and it undermined her argument about the severity of her COPD. The ALJ did not commit error by relying on this as part of his credibility determination.")

Nor is this the typical claim wherein a claimant continues to smoke a pack or so despite being directed to stop. Plaintiff smoked between 2 ½ packs and 4 packs of cigarettes a day. He was directed by nearly every health care provider to stop.

- April 7, 2003, prescribed nicoderm

- May 5, 2003, instructed to stop smoking

- January 25, 2004, told to stop smoking.

- March 22, 2004, instructed to stop smoking

- April 5, 2004, Plaintiff smoked ½ pack of cigarettes during the night

- May 17, 2004, instructed to stop smoking

- September 10, 2004, instructed to stop smoking

- October 12, 2004, instructed to stop smoking

- October 28, 2004, "discussed with Plaintiff, at length, that he needed to quit smoking."

- December 22, 2004, instructed to cease smoking

- January 4, 2005, instructed to stop smoking

- March 1, 2005, instructed to stop smoking

- November 16, 2006, instructed to stop smoking

- June 12, 2007, instructed to stop smoking

- July 26, 2007, instructed to stop smoking

- August 9, 2007, fell asleep with lit cigarette; slept with fire extinguisher beside his bed

- September 11, 2007, instructed to stop smoking

- October 17, 2007, instructed to "at least reduce tobacco use"

- November 6, 2007, instructed to stop smoking

- January 6, 2008, told to "stop smoking PLEASE" (with several underlines beneath the word please.

Not only did Plaintiff fail to stop smoking, he did not even reduce his tobacco use. At the hearing his counsel stated he "continued to smoke a great deal." In spite of that fact, as the ALJ noted, there did not appear to be any evidence of record that he needed oxygen. On November 14, 2007, Plaintiff's ventilatory function test showed only "mild" COPD. On September 10, 2008, a pulmonary function test showed "borderline" airway obstruction. In April 2009, Plaintiff's treating physician reported his COPD was controlled with medications. In response to the ALJ's questioning of Plaintiff's claim of needing oxygen, counsel stated that it was during a sleep study that his blood oxygen levels dropped into the '80's. On that basis, his treating physician prescribed the home oxygen for use at night for nine hours during sleep. Plaintiff failed to use the oxygen as prescribed by his treating physician, however, because he repeatedly smoked in bed, and so having the oxygen on at that time would be dangerous.

Plaintiff apparently therefore took it upon himself to decide to use the oxygen "on and off during the day," when there is no indication in the evidence that he needs it during the day or that it is even effective when used in a manner totally contrary to the reason prescribed. Plaintiff therefore not only failed to stopped smoking as directed, but failed to use his oxygen as prescribed.

Notably, counsel stated at the final hearing that Plaintiff "has seriously tried to quit, and I think the record shows he has made sincere efforts . . . ." The undersigned finds, however, the

record shows the exact opposite. There is no evidence in the record that Plaintiff even tried to cut down on his smoking. He never smoked fewer than two packs a day, and that was in 2003. He later smoked up to four packs a day. At the time of the hearing he still "smoked a great deal." He smoked in bed and had burned himself and his bedclothes, to the point he kept a fire extinguisher by the bed. Still, he risked his own, as well as his mother's life. He failed to use his oxygen as prescribed because he still smoked in bed. The quantity of cigarettes smoked prompted the ALJ at one of the hearings to ask how he could possibly afford his habit, when, as a number of his providers found, much of his depression was due to his "indigence." When asked, Plaintiff responded his mother paid for them. Notably, his mother was also on disability.

Again, despite the incredible amount of smoking Plaintiff did, his COPD was found to be mild, or borderline, or controlled by medications. Yet he told a physician that was his chief complaint. The undersigned is impressed by a statement by the Sixth Circuit in <u>Sias v. Secretary</u>, 861 F.2d 475 (6th Cir. 1988):

> The Social Security Act did not repeal the principle of individual responsibility . . . If the claimant in this case chooses to drive himself to an early grave, that is his privilege - - but if he is not truly disabled, he has no right to require those who pay social security taxes to help underwrite the cost of his ride.

The undersigned recognized that it is certainly possible that Plaintiff was so addicted to cigarettes that he continued smoking even in the face of shortness of breath and danger of fire or explosion. Even so, the ALJ presented enough other independent bases for discounting his testimony, and each finds ample support in the record. Thus, the ALJ's discussion of Plaintiff's continued smoking, even if erroneous, amounts to harmless error.

For all the above reasons, the undersigned United States Magistrate Judge finds that the ALJ's decision is supported by substantial evidence.

## V.  RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is supported by substantial evidence, and I accordingly recommend that the Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED.**

Any party may, within fourteen (14) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Proposed Findings of Fact and Recommendation for Disposition to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable Irene M. Keeley,  United States District Judge.  Failure to timely file objections to the Proposed Findings of Fact and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation.  28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _6_ day of August,  2013.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE